T.C. Memo. 2012-65

UNITED STATES TAX COURT

MICHAEL A. SCOTT, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 7558-08.                    Filed March 12, 2012.

R determined deficiencies in P's 1994-96 income tax and imposed fraud penalties under I.R.C. sec. 6663(a), based upon omission of gross income, determined under the bank deposits method of indirect proof.

1.  Held:  P omitted items of gross income from his 1994-96 Federal income tax returns.

2.  Held, further, P is liable for fraud penalties under I.R.C. sec. 6663(a).

3.  Held, further, R's determinations were timely under I.R.C. sec. 6501(c)(1), because P filed false or fraudulent returns.

Edward F. McLaughlin, for petitioner.

Carina J. Campobasso and Andrea D. Haddad, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge:  By notice of deficiency (notice), respondent determined deficiencies in, and civil fraud penalties with respect to, petitioner's Federal income tax as follows:[1]

| Year | Deficiency | Penalty sec. 6663(a) |
|------|-----------|----------------------|
| 1994 | $69,060 | $51,795 |
| 1995 | 124,018 | 93,014 |
| 1996 | 94,240 | 70,680 |

The issues for decision are:  (1) whether the periods of limitations for assessing and collecting the proposed deficiencies and penalties remain open, and if so, whether petitioner (2) underreported his business income by $92,103, $141,790, and $84,888[2] for 1994, 1995, and 1996 (years in issue), respectively,

---

[1]Unless otherwise stated, section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all amounts to the nearest dollar.

[2]In the notice, respondent determined that petitioner omitted gross receipts
(continued...)

(3) overstated his business deductions by $147,227, $197,739, and $183,762 for those years, respectively, and (4) is liable for the civil fraud penalty pursuant to section 6663(a) for each of those years.[3]

## FINDINGS OF FACT

Introduction

Some facts are stipulated and are so found. The stipulation of facts, with accompanying exhibits, is incorporated herein by this reference. At the time he filed the petition, petitioner resided in Massachusetts.

Petitioner's Dental Practice and His Work for Other Dentists

Petitioner is a dentist. He graduated from dental school in 1985, and, after working for other dentists for six years, opened his own dental practice, as a sole proprietorship, in 1991. In 1994, he moved his dental office to Reading,

---

[2](...continued)
of $102,772, $143,547, and $84,908 for 1994, 1995, and 1996, respectively. Towards the end of the trial, the parties proffered a joint exhibit, which listed the disputed gross amounts on Schedule C, Profit or Loss From Business, for each year in issue as $99,945, $158,458, and $111,461, for those years, respectively. On brief, respondent sets forth, as the unreported Schedule C amounts in dispute, the amounts in the text. We assume that respondent concedes those amounts as the upper bound on each year's unreported Schedule C amounts.

[3]There are also certain computational adjustments that follow from the adjustments at issue, but they are not in controversy, and we need not discuss them.

Massachusetts (Reading office). Generally, during the years in issue, petitioner worked four days a week, Monday through Thursday, in the Reading office, and, to supplement his income, he worked for other dentists on Fridays and Saturdays.

During 1994 and 1995, petitioner worked on Fridays for Dr. Albert Abrahamson and on Saturdays for Dr. Frank Wetherbee and, after Dr. Wetherbee sold his practice to Dr. Ramiro Blanco for Dr. Blanco. During 1995, petitioner also worked at the dental office of Osorio & Watkin, DMD PC (Osorio & Watkin). During 1996, petitioner similarly worked for other dentists; he also worked on a commission basis for a dental supply company.

Loans From American Investment Bank

In December 1993, March 1994, and May 1995, petitioner made written application to American Investment Bank, N.A. (AIB), for loans the proceeds of which he indicated would be used to buy dental equipment. On the first of those applications, he listed, among other liabilities, "Credit Card & Unsecured Debt" of $13,200 and "Other Debts", annotated "School Loans", of $56,136. He indicated an "ANNUAL PRE-TAX NET INCOME" of $160,000. He signed the application, certifying that he had carefully read it and the information was true and correct.

On the March 1994 application, he listed, among other liabilities, "Total Credit Cards" of $12,000 and "Other[,] School Loans" of $55,000. He indicated an annual pretax income of $150,000. He signed that application making the same certification. On an accompanying "Loan Data Verification Form", a record of an interview prepared by a bank loan officer, petitioner, when asked to review his unlisted debt, listed only an auto loan and credit card debt. The interviewer wrote: "All other debts have been disclosed." Under the heading "Other questions or comments", the interviewer wrote: "Dr's pre-tax net (after expense) income is ≈ $160,000." Petitioner signed the loan data verification form certifying under penalty of perjury that the information thereon was "complete, true and correct."

On the May 1995 application, petitioner listed, among other liabilities, "Credit Cards & Unsecured Debt" of $20,000 and "Other Debts-School Loans" of $30,000. He indicated an annual pretax income of $170,000. He signed the application certifying that the information was true and correct. On an accompanying, somewhat different, loan data verification form, the interviewer wrote: "1994 income is $170,000. Dr. states income is increasing. Moved to a new office late summer and income is up." Petitioner signed that loan data verification form certifying under penalty of perjury that the information thereon was complete, true, and correct.

## Petitioner's Bank Accounts

During the years in issue, petitioner maintained and made deposits to seven different bank accounts at different banks, including Fleet Bank and Bay Bank. He had sole dominion and control over all of those accounts.

## Credit Card Advances

During 1994, petitioner received the following credit card cash advances (credit card advances), totaling $30,800, that were deposited in several of his bank accounts:

Bank One credit card: $9,000 on July 1, 1994;[4] $4,000 on August 15, 1994;

MBNA credit card: $4,500 in July 1994;

Another MBNA credit card: $3,800 on July 2, 1994; $9,500 on July 20, 1994.[5]

---

[4]Petitioner's proposed finding of fact 19 identifies this credit card advance as having been received on September 14, 1994. Exhibit 88-J, p. 12, identifies it as having been received on July 1, 1994. We assume that the latter is the correct date.

[5]Petitioner's proposed finding of fact 22 identifies these two credit card advances (the $3,800 and $9,500 credit card advances) as having been received on July 21 and 22, 1994, respectively. Exhibit 88-J, p. 48, identifies them as having been received on July 2 and 20, 1994, respectively. We assume that the latter are the correct dates.

Financial Statements

In 1991, petitioner hired Joseph LaRosa, a certified public accountant, to prepare financial statements for his practice. Petitioner provided Mr. LaRosa with records from which he prepared for petitioner financial statements for calendar year 1993. Mr. LaRosa sent those statements to petitioner on March 18, 1994; the statements included a Statement of Revenue and Expenses–Cash Basis, which showed 1993 net income of $117,359. Petitioner did not request that Mr. LaRosa prepare his Federal or State tax returns.

Income Tax Return Preparation

In 1993, petitioner hired Sovereign United, a California accounting firm specializing in dental and medical practice tax return preparation, to prepare his individual Federal income tax returns. The organization designated J.A. Mattatal as petitioner's return preparer, and he prepared petitioner's 1993-96 tax returns.

1993 Return

Petitioner filed his 1993 Form 1040, U.S. Individual Income Tax Return, on September 12, 1994. He reported $781 of taxable income and zero dollars in wages, salaries, tips, etc. On the attached Schedule C, Profit or Loss From Business, petitioner described his business as a "dentistry service" (dental business). The Schedule C reported gross receipts of $448,837, cost of goods sold

of $103,518, expenses of $332,654, including $67,327 of "Other expenses" (other expenses), and a net profit of $12,665. An attachment shows other expenses to comprise miscellaneous expenses such as accounting, bank charges, business gifts, telephone, and the like.

1994 Return

Petitioner filed his 1994 Form 1040 on August 18, 1995. He reported zero taxable income and zero dollars in wages, salaries, tips, etc. The Schedule C, relating to petitioner's dental business, reported gross receipts of $489,864, cost of goods sold of $71,278, expenses of $469,886, including $147,227 of other expenses (similar to those claimed the year before), and a loss of $51,300. On the Schedule D, Capital Gains and Losses, petitioner reported $35,410 of receipts from sales of capital assets. On the Schedule E, Supplemental Income and Loss, he reported $3,658 of rental receipts.

1995 Return

Petitioner filed his 1995 Form 1040 on August 16, 1996, again reporting zero taxable income and zero dollars in wages, salaries, tips, etc. The Schedule C, relating to petitioner's dental business, reported gross receipts of $606,695, zero cost of goods sold, $613,925 of expenses, including $197,739 of other expenses (similar to those claimed the year before), and a loss of $7,230. On the Schedule

D, petitioner reported zero receipts from sales, reporting thereon only a short-term loss carryover. On the Schedule E, he reported $6,707 as rental receipts.

1996 Return

Petitioner filed his 1996 Form 1040 on October 2, 1997. He reported zero taxable income and $16,709 in wages, salaries, tips, etc. ($12,649 net of withholding). The Schedule C, relating to petitioner's dental business, reported gross receipts of $690,454, cost of goods sold of $114,011, $592,507 of expenses, including $183,762 of other expenses (similar to those claimed the year before), and a loss of $16,064. On the Schedule D, petitioner reported zero receipts from sales, reporting thereon only a short-term loss carryover. On the Schedule E, he reported $16,728 as rental receipts.

Initial Internal Revenue Service (IRS) Civil Examination

In August 1996, respondent initiated an examination of petitioner's 1994 Form 1040. Revenue Agent Thomas Demeo sent to petitioner an appointment letter and a Form 4564, Information Document Request, requesting that certain records be made available for examination. Petitioner refused to comply until provided with a copy of (1) Revenue Agent Demeo's "Oaths of Office" and (2) his bond certifying that he is "bonded both surety and fidelity by the government."

Revenue Agent Demeo faxed to petitioner a copy of his pocket commission;[6] petitioner, however, refused to comply with the Form 4564 request or to participate in a scheduled meeting absent a copy of the oath of office and bond.

As a result, Revenue Agent Demeo served summonses on several of the financial institutions at which petitioner held accounts. Upon learning of the summonses, petitioner sent a letter dated December 23, 1996, to Jamie Fraser, a Bay Bank official, threatening to hold her personally responsible if she complied with the summons absent an official court order. Petitioner also sent a letter dated January 15, 1997, to Denise Gage, a Fleet Bank official, threatening to sue for damages for violating their fiduciary relationship if she "compl[ied] with the defective Summons".

These and other financial institutions complied with the summonses, and, after receiving the requested documents, Revenue Agent Demeo prepared a preliminary bank deposits analysis from which he concluded that petitioner had understated his income and claimed excess deductions on his 1994 tax return. On the basis of that conclusion, he decided to extend his examination to petitioner's

[6]Pocket commissions are an authorized form of identification evidencing the bearer's authority when contacting the public and describe the specific authority and responsibilities of the authorized bearer. Internal Revenue Manual pt. 10.2.6.1 (Sept. 30, 2008).

1995 tax return. He sent to petitioner a letter, dated August 27, 1997, informing him that his 1994 tax return was still under examination and that respondent had initiated an examination of his 1995 return for "similar issues". Revenue Agent Demeo asked that petitioner contact him to discuss the 1994 examination; petitioner refused to do so until provided with documents proving Revenue Agent Demeo's authority.

Revenue Agent Demeo did not reply to petitioner but, on further analysis of the received bank records, he determined that there appeared to be large understatements of income and excess deductions in petitioner's returns. He prepared a report and referred petitioner's case to the IRS' Criminal Investigation Division (CID). In June 1998, however, he again contacted petitioner by letter, enclosing a Form 872, Consent to Extend the Time to Assess Tax, and requesting that he consent to extend the period of limitations to assess his 1994 income tax. Petitioner refused his consent without proof of Revenue Agent Demeo's examination authority.

IRS Criminal Investigation

CID received Revenue Agent Demeo's referral and conducted an investigation. In aid of that investigation, a CID special agent issued summonses to several banks and other persons to provide information. Petitioner moved in

U.S. District Court for the District of Massachusetts to quash the summonses, alleging that the summonses were issued in bad faith, "to harass and vex the recipients of * * * [the] summonses", and that the information sought was not relevant to the IRS' investigation. The District Court denied petitioner's motion, concluding, among other things, that "[b]eyond the conclusory allegations in the motion to quash, petitioner has made no showing of improper purpose, bad faith, or abuse of process." The CID investigation concluded with a decision not to prosecute petitioner. Respondent determined to continue its civil examination of petitioner's returns.

Continued IRS Civil Examination

Revenue Agent Demeo was no longer available to continue the civil examination of petitioner's returns; therefore, in June 2000, respondent assigned Revenue Agent Richard Barbati to examine petitioner's 1994 and 1995 returns. Revenue Agent Barbati subsequently expanded the examination to include petitioner's 1996 return. Because petitioner had not provided records of his income-producing activities during Revenue Agent Demeo's earlier examination, Revenue Agent Barbati reconstructed petitioner's 1994-96 income under the so-called bank deposits method.

To reconstruct petitioner's income for each year in issue, Revenue Agent Barbati: (1) identified and analyzed deposit tickets and bank deposits made to each of petitioner's seven bank accounts, (2) identified the source of all deposits (i.e., check, cash, credit card, and nontaxable sources[7]), and (3) prepared, for each examined bank account, a schedule of the amount and source of each deposit made to the account. Revenue Agent Barbati then calculated the total deposits plus amounts withheld from deposits (reflected in copies of bank deposit tickets) and compared each year's total deposits less identifiable nontaxable sources with the gross income reported on petitioner's tax return. He believed that, for each examined year, the difference (disagreed deposit) represented unreported gross income from petitioner's dental business for that year.

1994 Adjustment

During 1994, petitioner deposited $758,117 in his bank accounts. Of that amount, $148,082 represents transfers and other nonincome items (including the credit card advances), and interest and dividends that petitioner reported on his return. Revenue Agent Barbati determined the difference, $610,035, to be the

---

[7]Nontaxable sources include transfers between accounts, deposits not readily apparent as business receipts, returned checks, identifiable loans, and credit card advances. Revenue Agent Barbati also treated deposits of interest and dividend income as nontaxable deposits, apparently because he believed such receipts were adequately accounted for.

amount of petitioner's taxable deposits (other than interest and dividends) in his bank accounts. Revenue Agent Barbati compared that amount with the $517,932 of income reported on petitioner's 1994 return; i.e., the sum of the Schedule C receipts, $489,864, the Schedule D receipts, $24,410,[8] and the Schedule E receipts, $3,658. He determined the difference, $92,103,[9] to be petitioner's 1994 unreported receipts from his dental business.

1995 Adjustment

During 1995, petitioner deposited $820,037 in his bank accounts. Of that amount, $64,845 represents transfers and other nonincome items, and interest and dividends that petitioner reported on his return. Revenue Agent Barbati determined the difference, $755,192, to be the amount of petitioner's taxable deposits (other than interest and dividends) in his bank accounts. Revenue Agent Barbati compared that amount with the $613,402 of income reported on petitioner's 1995 return; i.e., the sum of the Schedule C receipts, $606,695, and the

---

[8]This amount excludes $11,000 of such receipts realized on the redemption of certificates of deposit at no gain or loss, which Revenue Agent Barbati characterized as nontaxable transfers.

[9]This amount is less than the amount of unreported receipts determined in the notice because it reflects Revenue Agent Barbati's revision, during trial preparation, to his bank deposits analysis, which respondent adopted on brief. As we stated supra note 2, we assume that respondent concedes this amount as the upper bound on the year's unreported Schedule C amount.

Schedule E receipts, $6,707. He determined the difference, $141,790,[10] to be petitioner's 1995 unreported receipts from his dental business.

1996 Adjustment

During 1996, petitioner deposited $875,776 in his bank accounts. Of that amount, $71,057 represents transfers and other nonincome items, and interest and dividends that petitioner reported on his return. Revenue Agent Barbati determined the difference, $804,719, to be the amount of petitioner's taxable deposits (other than interest and dividends) in his bank accounts. Revenue Agent Barbati compared that amount with the $719,831 of income reported on petitioner's 1996 return; i.e., the sum of net wages after withholding, $12,649, the Schedule C receipts, $690,454, and the Schedule E receipts, $16,728. He determined the difference, $84,888,[11] to be petitioner's 1996 unreported receipts from his dental business.

All Years

Revenue Agent Barbati also determined that, for each year in issue, the deductions claimed on petitioner's Schedule C for other expenses should be disallowed in full for lack of substantiation.

---

[10]See supra note 9.

[11]See supra note 9.

Notice of Deficiency

In an attachment to the notice, respondent explained that, for each year in issue, his determination of a deficiency in tax was principally due to his adjustments (1) increasing petitioner's gross receipts from his dental business and (2) disallowing in full the Schedule C deductions for other expenses. Respondent also explained his determination of a section 6663(a) civil fraud penalty for each year in issue.

OPINION

I.    Period of Limitations

A.    Introduction

Section 6501(a) provides, generally, that the amount of any tax must be assessed within three years of the filing of a return. Pursuant to section 6501(c)(1), however, if a taxpayer files "a false or fraudulent return with the intent to evade tax, the tax may be assessed * * * at any time." The parties agree that, unless his returns for the years in issue were made falsely or fraudulently with the intent to evade tax, the period of limitations on assessment and collection of petitioner's income taxes for those years has expired.

Respondent has the burden of proving an exception to the general limitations period, see, e.g., Harlan v. Commissioner, 116 T.C. 31, 39 (2001), and his burden

here is the same as his burden under section 6663 to prove applicability of the civil fraud penalty (which is also at issue), see, e.g., Browning v. Commissioner, T.C. Memo. 2011-261. Respondent must establish by clear and convincing evidence that petitioner filed false and fraudulent returns with the intent to evade tax. See sec. 7454(a); Rule 142(b). To do so, respondent must establish by clear and convincing evidence both that (1) petitioner underpaid his income tax for each year in issue and (2) at least some portion of each such underpayment was due to fraud. See e.g., DiLeo v. Commissioner, 96 T.C. 858, 873 (1991), aff'd, 959 F.2d 16 (2d Cir. 1992).

### B. Underpayments of Tax

#### 1. Introduction

Where allegations of fraud are intertwined with unreported and indirectly reconstructed income (e.g., under the bank deposits method), it is properly part of the Commissioner's case to investigate and negative reasonable explanations of nontaxable sources advanced by the taxpayer. Holland v. United States, 348 U.S. 121, 135-136 (1954); Meier v. Commissioner, 91 T.C. 273, 296-297 (1988). If the taxpayer claims specific nontaxable sources and the Commissioner negatives those sources, the Commissioner need neither investigate and negative all possible nontaxable sources nor prove a likely source of taxable income because it is

reasonable to believe that the taxpayer making such claims did not have access to any other nontaxable sources.  See Holland v. United States, 348 U.S. at 137-138; Kramer v. Commissioner, 389 F.2d 236 (7th Cir. 1968); Commissioner v. Thomas, 261 F.2d 643, 646 (1st Cir. 1958), rev'g and remanding T.C. Memo. 1955-46; DiLeo v. Commissioner, 96 T.C. at 873-874; Boone v. Commissioner, T.C. Memo. 1997-471, aff'd, 208 F.3d 212 (6th Cir. 2000).  There is also no necessity of proof of a likely taxable source if the taxpayer advances no specific nontaxable sources and the Commissioner negatives all possible nontaxable sources.  See United States v. Massei, 355 U.S. 595 (1958).  Where, however, the Commissioner does not do so, proof of a likely taxable source of deposits is sufficient to meet his burden of establishing unreported income.  See id.  In any event, the Commissioner must not only show that the taxpayer had unreported income but that he underpaid his tax.  E.g., Ferguson v. Commissioner, T.C. Memo. 2004-90.

  2.  Likely Source

    We have found that petitioner is a dentist and that, during the years in issue, he carried on his own dental practice as well as worked two days a week for other dentists (and in 1996, worked on commission for a dental supply company).  Petitioner's tax returns for those years are in evidence, and we have found that for each year he reported substantial receipts from his dental business.  Petitioner can

disagree with neither of those findings. Respondent argues that petitioner's own dental practice plus his work for other dentists is a likely source of the disagreed deposits that, for each year in issue, Revenue Agent Barbati had determined to be unreported receipts from his dental business. In support of that argument, respondent proposes among other things that we find (and draw from the finding a negative inference) that petitioner produced no books or records showing how much he worked for other dentists during the years in issue.

Petitioner objects to that finding on the ground that he produced yearend tax data organizers that he provided each year to his tax return preparer, Mr. Mattatal, which show the amounts he reported as received from other dentists and the dental supply company. While that much is true, petitioner introduced no supporting schedules or other detail showing the dates he worked for other dentists, the amounts he received from employment on those dates, or how he computed the yearend totals. The yearend tax data organizers show $44,505 earned from Drs. Abrahamson and Wetherbee in 1994, $23,089 earned from Drs. Abrahamson, Wetherbee, and Blanco in 1995, and $16,833 earned from Practice Builders and "Assoc Dental" in 1996. If during each of those years petitioner worked two days a week, 50 weeks a year, for other dentists, his average daily take, according to the yearend tax organizers, was $445, $231, and $169, for 1994, 1995, and 1996,

respectively. Those averages are less (substantially less for 1995 and 1996) than the midpoint, $550, of the range, $300 to $800, that petitioner testified he could earn daily from working for other dentists. We have little confidence in petitioner's records with respect to the amounts he received from working for other dentists, and we certainly do not view them as establishing for each year the upper bound on those receipts. Moreover, respondent does not limit his claim of a likely source to only the income petitioner earned working for other dentists but includes petitioner's own practice, with respect to which we have no assurance petitioner faithfully reported all receipts.[12] It is not necessary that we find likely sources capable of generating all of the income that respondent claims petitioner failed to report; it is sufficient that we find likely sources for a substantial portion of it. United States v. Costanzo, 581 F.2d 28, 33 (2d Cir. 1978); Murphy v. Commissioner, T.C. Memo. 1980-25. That much seems clear here.

We conclude that respondent has proved by clear and convincing evidence a likely source for income (i.e., gross income) that, allegedly, petitioner failed to report for the years in issue; viz, the work he performed for other dentists, his own

---

[12]Although Joyce O'Brien, the Reading office's office manager, testified as to the collection and deposit of the Reading office's receipts, her testimony does not convince us that petitioner faithfully reported all receipts on his individual tax returns.

dental practice, and his commission-based work, in 1996, for the dental supply company.

### 3. Nontaxable Source

#### a. Introduction

Notwithstanding respondent's success in proving a likely source for income that, allegedly, petitioner failed to report on his 1994-96 tax returns, petitioner claims that he reported all of his receipts constituting items of income and that, for each year in issue, the disagreed deposits can be explained by nontaxable sources.

#### b. Loan Proceeds

Petitioner proposes that we find that from 1994 through 1996 he received, and deposited in several of his bank accounts, $85,500 in loan proceeds from other dentists and that those amounts constitute nontaxable sources for at least a portion of the disagreed deposits. In particular, he proposes that we find that he received the following:

(1) loans during 1994 through 1996 totaling $18,000 in cash from a Dr. White;

(2) loans between 1994 and 1995 totaling $23,000 from a Dr. Vennochi;

(3)  loans between 1994 and 1996 totaling $10,000 from a Dr. Geof[13] Glovsky, Jr.;

(4)  loans between 1994 and 1996 totaling $25,000 from a Dr. Joel Glovsky, Sr.;

(5)  loans between 1994 and 1996 totaling $9,500 from a Dr. Rellas.

Petitioner proffered no documents evidencing any loans from Dr. White; instead, he relied on his recollection to state the loan amounts.  In support of the proposed finding of loans totaling $23,000 from Dr. Vennochi between 1994 and 1995, petitioner asks that we find that the loan "was later reduced to a writing to reflect the loan amount of $23,000".  To support that proposed finding, he refers us to Exhibit 90-P, which apparently is a sheet of petitioner's business stationery with handwriting thereon.  The writing does not, however, refer to a loan by Dr. Vennochi but does state that it is an acknowledgment that Dr. Geof Glovsky has lent petitioner $10,000 to be paid in 12 installments at 14.9% interest.  It is dated June 22, 1994, and appears to be signed by Drs. Scott and Glovsky.  It does not state the date of the loan or the expected dates of repayment.  Petitioner does not in his proposed findings direct us to any writings evidencing any loans to him by Dr. Glovsky, Sr., or Dr. Rellas.

---

[13]In petitioner's proposed finding of fact, he indicates that Dr. Glovsky, Jr.'s first name is Joel.  At trial, however, petitioner referred to him as Dr. Geof Glovsky, Jr.  We assume that Dr. Glovsky, Jr.'s first name is "Geof".

Absent from the record is evidence supporting the deposit into any of petitioner's bank accounts during the years in issue of loan proceeds from the alleged lenders. We cannot find any deposited check from an alleged lender with markings indicating that the check represented a loan.

c.     Gifts

Petitioner proposes that we find that his father, Dr. Austin Scott, made gifts to him between late 1993 and 1994 totaling $20,000. He produced no documents evidencing the gifts.

d.     Credit Card Advances

Petitioner proposes that we find that he deposited the credit card advances. We have done so.[14] See supra.

e.     Loan Repayment

Petitioner proposes that we find that, sometime in 1994 or 1995, John Apostulou repaid to him a loan of $1,400. Petitioner proffered no documents evidencing that loan repayment transaction.

_____

[14]Petitioner proposes that we also find that he received, on July 6, 1994, a credit card advance of $4,500. We need not address this proposed finding because, on brief, he did not object to respondent's proposed finding that respondent determined, as nontaxable income in 1994, $48,300 of credit card advances, which is a higher amount than what petitioner claims.

### f.  Cash Hoard

Petitioner proposes that we find that he had a $35,000 cash hoard in 1994 and that he deposited in his bank accounts, in 1994, $15,000 from the cash hoard.  He proffered no documents evidencing that deposit.

### g.  Analysis

Petitioner is uncertain as to the timing of his alleged loan and gift receipts. We display below the results if we credit those receipts in full to each of the years in which petitioner said they might have been received and credit to the years those items of which he was more certain.  We disregard the credit card advances because Revenue Agent Barbati took more than petitioner's proposed amount into account in his bank deposits analysis, treating the advances as nontaxable deposits, and thus the credit card advances cannot explain the 1994 disagreed deposits.

Table 1

|  | 1993 | 1994 | 1995 | 1996 |
|---|---|---|---|---|
| Loans | -0- | $18,000 | $18,000 | $18,000 |
|  | -0- | 23,000 | 23,000 | -0- |
|  | -0- | 10,000 | 10,000 | 10,000 |
|  | -0- | 25,000 | 25,000 | 25,000 |
|  | -0- | 9,500 | 9,500 | 9,500 |
| Gifts | $20,000 | 20,000 | -0- | -0- |
| Loan repayment | -0- | 1,400 | -0- | -0- |
| Cash hoard | -0- | 15,000 | -0- | -0- |
| Sum | 20,000 | 121,900 | 85,500 | 62,500 |

The amounts of disagreed deposits for 1995 and 1996 are $141,790 and $84,888, respectively, and, even if we were to credit his proposed findings as to nontaxable sources for those years (which we do not), petitioner has failed to propose sources adequate to explain all of the disagreed deposits for those years. Moreover, even had respondent failed to show a likely source for the disagreed deposits, he carries his burden of showing unreported income by showing that his determination of the disagreed deposits is accurate (discussed in section II.B.2., infra, of this report) and by negating each nontaxable source alleged by petitioner. See Parks v. Commissioner, 94 T.C. 654, 661 (1990). The unexplained excesses clearly and convincingly evidence unreported income for 1995 and 1996.

As for 1994, the uncertainty of petitioner's proposed findings with respect to the timing of the claimed loans and gifts leaves open the possibility that, were we to credit the proposed findings, he may have received in 1994 the amount of loans and gifts shown in table 1, which exceed the disagreed deposits for that year. Given that petitioner is in a better position than is respondent to know when he received the claimed loans and gifts, to reduce the uncertainty, we think it appropriate to assume that, if received, the loans and gifts were received proportionally over the identified periods. Recalculating on that basis yields the following.

### Table 2

|  | 1994[1] |
|---|---|
| Loans | $6,000 |
|  | 11,500 |
|  | 3,334 |
|  | 8,334 |
|  | 3,167 |
| Gifts | 10,000 |
| Loan repayment | 1,400 |
| Cash hoard | 15,000 |
| Sum | 58,735 |

[1]We do not recalculate tax years 1995 and 1996 since the respective sums would again be less than the disagreed deposits for those years.

The disagreed deposits for 1994 are $92,103, and, similar to 1995 and 1996, even if we were to credit his proposed finding as to nontaxable sources for 1994, modified as we have done (and we do not credit it[15]), petitioner has failed to propose nontaxable sources adequate to explain all of the disagreed deposits. The unexplained excess clearly and convincingly evidences unreported income for 1994.

4.    Conclusion

For each year in issue, respondent has shown a likely taxable source for a substantial portion of the disagreed deposits that respondent claims measure petitioner's unreported gross income for that year. Petitioner offers nontaxable sources that, when measured against those disagreed deposits, also are substantial in amount. We need not determine whether petitioner's claimed nontaxable sources provide reliable cover because, for each year, they are inadequate to explain all of that year's disagreed deposits and that is sufficient to show that he underreported his income for that year. See United States v. Massei, 355 U.S. at 595; DiLeo v. Commissioner, 96 T.C. at 873-874; Clark v. Commissioner, T.C. Memo. 2001-205. Moreover, petitioner makes no argument that he has unclaimed deductions or credits

_____

[15]We do not credit it for the reasons specified in sec. II.B.3., infra, of this report in which we determine the amount of petitioner's unreported income for each year in issue.

that would reduce the tax burden attributable each year to his unreported income. Although petitioner reported a loss from his dental business on his 1994-96 Schedules C for each of those years, respondent disallowed other expenses in an amount sufficient to eliminate that loss, which means that, if we sustain those disallowances (which we do), petitioner's underreporting of income resulted each year in his underpaying his tax.[16]

Respondent has shown, and we find, that petitioner underreported his gross income and, consequently, underpaid his tax for each year in issue.

C.    Fraudulent Intent

1.    Introduction

The second prong of the fraud test requires the Commissioner to prove that, for each year, at least some portion of the taxpayer's underpayment of tax is due to fraud. Fraud for that purpose is defined as intentional wrongdoing, with the specific purpose of avoiding a tax believed to be owed. E.g., DiLeo v. Commissioner, 96 T.C. at 874. In other words, respondent must prove petitioner's state of mind; to wit, whether he intended to evade tax believed to be owing by

---

[16]"[E]vidence of unexplained receipts shifts to the taxpayer the burden of coming forward with evidence as to the amount of offsetting expenses". Siravo v. United States, 377 F.2d 469, 473 (1st Cir. 1967); Lenihan v. Commissioner, T.C. Memo. 2006-259.

conduct intended to conceal, mislead, or otherwise prevent the collection of tax. See e.g., <u>Browning v. Commissioner</u>, T.C. Memo. 2011-261. A fraudulent state of mind may be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. <u>See</u> <u>DiLeo v. Commissioner</u>, 96 T.C. at 874.

Over the years, courts have developed a nonexclusive list of factors that demonstrate fraudulent intent. Those badges of fraud include: (1) understating income, (2) maintaining inadequate records, (3) failing to file tax returns, (4) implausible or inconsistent explanations of behavior, (5) concealment of income or assets, (6) failing to cooperate with tax authorities, (7) engaging in illegal activities, (8) an intent to mislead which may be inferred from a pattern of conduct, (9) lack of credibility of the taxpayer's testimony, (10) filing false documents, and (11) dealing in cash. <u>E.g.</u>, <u>Browning v. Commissioner</u>, T.C. Memo. 2011-261 (and cases cited therein). Although no single factor is necessarily sufficient to establish fraud, a combination of factors is more likely to constitute persuasive evidence. <u>E.g.</u>, <u>id.</u> A taxpayer's intelligence, education, and tax expertise are also relevant for purposes of determining fraudulent intent. <u>E.g.</u>, <u>id.</u>

2.      Discussion

The following factors indicate petitioner's fraudulent intent during each year in issue.

a.      Understatement of Income

A pattern of consistent underreporting of income, particularly when accompanied by other circumstances exhibiting an intent to conceal, justifies the inference of fraud. Parks v. Commissioner, 94 T.C. at 664; Marretta v. Commissioner, T.C. Memo. 2004-128, aff'd, 168 Fed. Appx. 528 (3d Cir. 2006). Petitioner underreported his income for each year in issue. Although 1993 is not a year in issue, on the basis of the financial statements Mr. LaRosa prepared, it is likely that petitioner also underreported his income on his 1993 Form 1040.[17]

b.      Maintenance of Inadequate Records

Taxpayers are required to keep such records as are necessary for the determination of tax. See sec. 6001. Respondent attributes substantial portions of the disagreed deposits to amounts that petitioner earned from working for other dentists. While petitioner concedes that he worked for other dentists during the

---

[17]It is notable that petitioner received the 1993 financial statements on March 18, 1994, showing net income of $117,359, before he filed, on September 12, 1994, his 1993 Form 1040, reporting a $12,665 net profit from his dental business and $781 of taxable income.

years in issue, and, indeed, he appears to have reported amounts earned from that employment, the only records we have in evidence supporting the reported amounts are his yearend tax organizers, obviously prepared at or after the close of each tax year for the purpose of income tax reporting. As we stated supra, we have little confidence in his records of earnings from such employment because petitioner provided no supporting schedules or other data showing the dates he worked for those other dentists, the amounts he received from employment on those dates, or how he computed the yearend totals. While petitioner claims he received a "1099, or a W-2" from each dentist for whom he worked, he failed to produce any such documents.

Petitioner's principal defense to respondent's argument that the disagreed deposits constitute unreported income is that they represent deposits of numerous loan proceeds, yet, except perhaps in one case, he has no records evidencing any such loan.

He testified to substantial gifts from his father, but again has no record to support that testimony. Indeed, his testimony is contradicted by his own answer to a discovery request in which he asserted that he received a $20,000 loan (not a gift) from his father.

He testified to a cash hoard kept in a lockbox but again offered nothing to support that testimony.

Finally, in addition to unreported income, this case concerns petitioner's failure to substantiate other expenses claimed on his 1994-96 Schedules C. Petitioner produced no records to substantiate those expenses. He attributes his lack of records to the fact that, beginning in 1994, recurring office floods destroyed most of his business records, which he kept in paper form in the Reading office. We are unconvinced, finding it incredible that petitioner would not have modified his recordkeeping practices to guard against what he contends was, and continues to be, extremely frequent and significant water damage.

We find petitioner's failure to keep or produce adequate records to support his tax return positions to be an indicium of fraud.

### c. Failure To Cooperate With Tax Authorities

We set forth supra the details of respondent's examinations and investigation of petitioner's tax returns. Respondent proposes, and petitioner does not object, that we find that "[p]etitioner was uncooperative and made frivolous arguments regarding the government's authority to continue with the examination of petitioner's tax returns." Indeed, in his brief, petitioner argues that "[i]n the instant case the petitioner's lack of cooperation and his alleged understatement of income remain as

the only indication that he intend[ed] to evade or defeat the tax." We adopt in substance respondent's proposed finding and find that petitioner did not cooperate in respondent's examinations of his 1994-96 income tax returns and investigation with respect to his 1994 and 1995 tax returns.

### d. Credibility of Petitioner's Testimony

A taxpayer's lack of credibility, "the inconsistencies in his testimony and his evasiveness on the stand[,] are heavily weighted factors in considering the fraud issue." Toussaint v. Commissioner, 743 F.2d 309, 312 (5th Cir. 1984), aff'g T.C. Memo. 1984-25; Devries v. Commissioner, T.C. Memo. 2011-185.

A central issue in this case is the amount of petitioner's income for each of the years in issue. Petitioner testified that he provided Mr. Mattatal with generally accurate information to use in preparing his 1994-96 tax returns. Petitioner's 1993 taxable year is not in issue, yet for that year he reported on his 1993 Form 1040 taxable income of $781 and Schedule C income of $12,665. For each of the years in issue, 1994 through 1996, he reported on his Form 1040 zero taxable income, and he reported Schedule C losses of $51,300, $7,230, and $16,064 for those years, respectively. In December 1993, March 1994, and May 1995, he also submitted written loan applications to AIB on which he reported his pretax income for those years as $160,000, $150,000, and $170,000, respectively. He certified

that information to be true and correct, and, with respect to the 1994 and 1995 applications, he also signed loan data verification forms certifying under penalties of perjury that the information was complete, true, and correct.[18]

Petitioner filed his 1994 and 1995 Forms 1040 after submitting the May 1995 AIB loan application; however, he filed his 1993 Form 1040 on September 12, 1994, approximately eight months before he submitted that application. He testified that, when he made the application, he had his 1993 Form 1040 in front of him. He explained that the difference between the $781 of taxable income reported on his 1993 Form 1040 and the $170,000 reported on the May 1995 AIB application was due to his "guesstimate" of that latter sum or confusion between the concepts of net and gross income. He testified that he based his guesstimate on a hope that he would earn more money than in 1993. However, on the loan data verification form accompanying the May 1995 application, petitioner certified, under penalty of perjury, that his 1994 income was $170,000 and that his income was increasing.

---

[18]Petitioner signed the loan data verification form accompanying the March 1994 application on March 15, 1994. The form states that petitioner's net income is approximately $160,000 a year. On March 18, 1994, petitioner received from Mr. LaRosa financial statements showing 1993 net income of $117,359. Petitioner has not reconciled the discrepancy or testified that he brought it to the attention of AIB.

At that time (May 1995), tax year 1994 had already closed and, as his 1994 Form 1040 would show, his dental business <u>lost</u> $51,300 in 1994. Mr. LaRosa, who did accounting work for petitioner from 1991 to 1994, testified that petitioner was very interested in the practice management aspects of his dental business, including appropriate ratios between receipts and expenses. We assume from that and from petitioner's testimony concerning his efforts to manage the Reading office's cashflow that, throughout each year, he stayed aware of the financial aspects of his business. We believe that, in May 1995, petitioner not only knew the amount of income that he had reported on his 1993 Form 1040 but also had a good idea of the amount of his business income in 1994. We believe that petitioner either lied to AIB on the May 1995 application or lied to respondent on his 1994 Form 1040, and we think the latter is more probable.

We are also faced with the discrepancy between petitioner's failure on any of the AIB loan applications or accompanying verification forms to list any of the loans from other dentists that he claims explain most of the disagreed deposits. On the December 1993 and May 1995 loan applications, petitioner shows as "Credit Cards & Unsecured Debt" $13,200 and $20,000, respectively. On the March 1994 loan application and accompanying loan verification form, however, petitioner shows that his credit card debt (not including unsecured debt) is approximately

$12,000 and the verification form states: "All other debts have been disclosed." On the March 1994 application itself, petitioner lists school loans and real estate debt but nothing for the substantial debt that he claims he owed other dentists. We thus assume that, at least in March 1994, petitioner informed AIB that he had no indebtedness of the type that he now claims explains the 1994 disagreed deposits. Moreover, we cannot tell whether the $13,200 and $20,000 of combined credit card and unsecured debt listed on the December 1993 and May 1995 applications, respectively, comprised, to any degree, indebtedness to other dentists. Because of petitioner's testimony with respect to the Reading office's cashflow deficiencies during the years in issue, we suspect much, if not all, of that category constituted credit card debt. We are thus faced with another seeming contradiction; i.e., between what petitioner told AIB about his indebtedness and his testimony to us.

The record also discloses discrepancies between petitioner's responses to discovery and his testimony at trial. As stated supra section I.C.2.b. of this report, in answering an interrogatory petitioner claimed that his father, Dr. Scott, lent him $20,000, but he subsequently testified that his father made a gift to him of $20,000. Petitioner was also inconsistent in describing an alleged nontaxable receipt from Mr. Apostulou. In answering an interrogatory, he claimed that he received a $1,400 loan

from Mr. Apostolou at some point between 1994 and 1996; he did not identify Mr. Apostolou as a recipient of any loan that he had made during that period.  At trial, however, petitioner testified that <u>he</u> lent <u>to</u> Mr. Apostolou $1,400 in 1994 or 1995 and that Mr. Apostolou repaid him, the proceeds of which were deposited into one of his bank accounts between 1994 and 1996.  Those may be minor inconsistencies, but they cumulate with other evidence concerning credibility.

Finally, petitioner's demeanor during his testimony also brings his credibility into question.  His memory was clear as to those things that we assume he believed benefited his case but was cloudy, evasive, or just downright unbelievable in other respects.  He testified that, at the end of 1991, although he had as much as $65,000 of school debt and had incurred as much as $50,000 of debt to purchase his practice ("It was 25–45–50 thou.  I don't remember the exact amount."), he maintained a lockbox (a cash hoard) containing "probably 30, $40,000" from which, in 1994, he deposited $15,000 to his bank accounts.  Petitioner did not before trial volunteer any information about a cash hoard, nor at trial did he offer any evidence (other than his testimony) of its existence.  He was inexact about its balance at any time.  That petitioner would maintain a substantial cash hoard at a time when his cash needs

were substantial seems to us doubtful.  Simply put, we fail to believe his testimony about the existence of the cash hoard.

Petitioner's testimony on some points contradicted his discovery responses and lacked credibility in several important areas.  We consider those faults to be evidence of his fraudulent intent.

### 3.    Conclusion

Petitioner is intelligent and well educated.  On three occasions, he represented to AIB amounts of income that, while perhaps exaggerated, indicate to us that he knew that he had more income than he reported on his Forms 1040 for the years in issue.  He undoubtedly understood that filing inaccurate returns would hamper respondent's ability to collect from him the correct tax.  On the basis of the factors discussed supra, we conclude that by clear and convincing evidence respondent has proved that petitioner filed fraudulent tax returns for 1994, 1995, and 1996 with intent to conceal, mislead, or otherwise prevent the collection of tax, and we so find.

### D.    Conclusion

Because petitioner filed false or fraudulent Forms 1040 for each year in issue, the general three year period of limitations of section 6501(a) does not apply, and

the tax may be assessed at any time.  See sec. 6501(c)(1).  The notice was, thus, timely.

II.   Deficiencies in Tax

A.   Introduction

We have determined that petitioner underpaid his tax for 1994, 1995, and 1996 and that because a portion of each underpayment was due to fraud, respondent may assess and collect petitioner's deficiencies in tax for those years.  We must now determine the amount of each year's deficiency in tax.  Petitioner bears the burden of proof.  See Rule 142(a).[19]

B.   Underreported Income

1.   Introduction

The disagreed deposits for the years in issue are as follows:

| Year | Amount |
|------|--------|
| 1994 | $92,103 |
| 1995 | 141,790 |
| 1996 | 84,888 |

[19]Petitioner makes no argument that, pursuant to sec. 7491(a), the burden shifts to respondent.  In any event, the record establishes that petitioner does not satisfy the preconditions found in sec. 7491(a)(2) for shifting the burden; e.g., he failed to maintain records and he failed to cooperate with the Secretary in his examinations and investigation, both as required by sec. 7491(a)(2)(B).

Respondent argues that the disagreed deposits for each year constitute unreported gross income petitioner derived from his own dental practice, his work for other dentists, and his commission-based work in 1996 for a dental supply company. Respondent arrives at that conclusion on the basis of the bank deposits analysis Revenue Agent Barbati prepared.[20] While we have determined that petitioner underreported his income for each year in issue, we have not determined by how much.

### 2. Bank Deposits Analysis

Petitioner accepts that a bank deposits analysis is a legitimate method of indirect proof of unreported income, and he directs us to the U.S. Court of Appeals for the First Circuit's description of the Commissioner's initial evidentiary burden in proving unreported income by that method. In United States v. Morse, 491 F.2d 149, 152 (1st Cir. 1974), the court stated that the Government must show: "(1) that, during the tax years in question, the taxpayer was engaged in an income producing business or calling; (2) that he made regular deposits of funds into bank accounts;

---

[20]Respondent notes that Revenue Agent Barbati's bank deposits analysis was conservative because he omitted the cash expenditure component of the traditional bank deposits and cash expenditure analysis. See generally United States v. Abodeely, 801 F.2d 1020, 1023-1024 (8th Cir. 1986).

and (3) that an adequate and full investigation of those accounts was conducted in order to distinguish between income and non-income deposits."

Petitioner makes no argument that respondent fails to meet the first two requirements. He argues only that, in violation of the third requirement, respondent did not conduct an adequate and full investigation of petitioner's bank accounts to distinguish between income and nonincome deposits. Petitioner asserts that although he informed respondent of nonincome sources of the disagreed deposits (particularly loan proceeds, discussed supra section I.B.3.b. of this report, and credit card advances), respondent failed to investigate or contact the identified lenders and credit card companies to substantiate the claim. In support of that argument petitioner proposes the following finding of fact: "70. No evidence was presented that the respondent made any effort to interview or contact the licensed dentists that the petitioner identified in his responses to interrogatories as having loaned him money during the tax years 1994, 1995, and 1996. Stip. Ex. 71J, #18." The referenced stipulated exhibit is a copy of Petitioner's Answers and Objections to Respondent's Interrogatories. One of respondent's interrogatories requests that petitioner identify loans he received in 1994 through 1996. He was asked to identify each lender and to provide his or her current address and telephone number.

In response, petitioner identified as lenders Drs. White, Vennochi, Glovsky, Jr., and Glovsky, Sr., Austin Scott, and John Apostolou. He provided no first names for the first four and no addresses or telephone numbers for any, stating: "The addresses and telephone numbers are all publically available." At trial, petitioner testified that Austin Scott (Dr. Scott, his father) died in 1996.

The adequacy of an investigation under the bank deposits method "turns on its own circumstances." United States v. Slutsky, 487 F.2d 832, 841 (2d Cir. 1973). As we stated supra section I.B.1. of this report, if a taxpayer offers an explanation of nontaxable sources reasonably susceptible of being checked, the Commissioner has a duty to investigate and negative any such explanation. Holland v. United States, 348 U.S. at 138; Meier v. Commissioner, 91 T.C. at 296-297. "The critical question is whether the government's investigation has provided sufficient evidence to support an inference that an unexplained excess in bank deposits is attributable to taxable income." United States v. Stone, 770 F.2d 842, 844-845 (9th Cir. 1985).

Although it was petitioner's obligation to provide respondent with information as to the sources of his bank deposits, he chose not to do so during respondent's examinations and investigation. Receiving no information from petitioner, respondent had no leads to pursue. To identify nonincome deposits, respondent

sought bank records and copies of deposited checks and, on the basis of his examination of transactions detailed in those documents, excluded from deposit those items he determined to be nontaxable. Apparently, only during respondent's conduct of discovery (which respondent had no obligation to undertake) did petitioner identify individuals who he claimed had lent him money. But petitioner failed to answer a specific request for the addresses and telephone numbers of those individuals who, for the most part, he identified only by title and last name. Undoubtedly, if the not-fully-identified individuals existed, he knew their first names. Putting that fact together with his refusal to provide addresses and telephone numbers, we conclude that, at best, he intended to make things difficult for respondent. In addition, petitioner undoubtedly knew that his father, Dr. Scott, had been dead for over 10 years but did not disclose this fact, suggesting instead that his father's address and telephone number were publicly available. We conclude that petitioner's answers to respondent's interrogatory were not made in a good-faith effort to identify nontaxable sources and to assist respondent in verifying them.

Petitioner has not shown that at any point (either before or after respondent issued the notice) he volunteered information to respondent and cooperated with him in identifying those he claimed had lent him money. All in all, we think that the

lender information that respondent obtained during discovery was insufficient to obligate him to further search for information that petitioner was in the best position to provide. See, e.g., Enayat v. Commissioner, T.C. Memo. 2009-257 (the taxpayer failed to provide credible evidence to prove that third-party loans were made and the proceeds deposited into his disregarded entity's bank accounts, "and we therefore find no fault in the IRS's declining to reduce net deposits to account for these unsubstantiated loans").

We find no fault in respondent's bank deposits analysis for any of the years in issue.

### 3. Nontaxable Sources

Respondent has shown a likely taxable source for the disagreed deposits, and, in any event, for purposes of sustaining an adjustment in a notice of deficiency increasing gross income, a bank deposit is prima facie evidence of income, Tokarski v. Commissioner, 87 T.C. 74, 77 (1986), imposing on petitioner the burden of proving otherwise, DiPierro v. Commissioner, T.C. Memo. 1999-189. Petitioner claims the disagreed deposits "were attributable to loans and credit card advances".

We have made findings with respect to petitioner's receipt of credit card advances (all of which he identifies as being deposited in his bank accounts in

1994). The credit card advances, however, do not serve to explain the disagreed deposits for 1994 because, as we stated supra section I.B.3.g. of this report, Revenue Agent Barbati took more than petitioner's proposed amount into account in his bank deposits analysis and treated the advances as nontaxable deposits.

We identified supra section I.B.3.b. of this report petitioner's proposed findings regarding loan proceeds that, from 1994 through 1996, he claims he received from other dentists and deposited in several of his bank accounts. We have made none of those proposed findings because, except perhaps in one case, petitioner cannot substantiate either the loan or the deposit, and we need not take him at his word. See Tokarski v. Commissioner, 87 T.C. at 77.

Although Exhibit 90-P, discussed supra section I.B.3.b. of this report, is dated June 22, 1994, and states that it is an acknowledgment of a $10,000 loan from Dr. Geof Glovsky to petitioner, it fails to support petitioner's claim that the proceeds of the alleged loan were deposited into any of his bank accounts during any of the years in question. For lack of substantiation and because of questions with respect to his veracity,[21] we likewise do not find that petitioner (1) had a cash hoard, (2) in1994 received any loan from Dr. Scott, or (3) in 1994 or 1995, received a loan repayment of $1,400 from Mr. Apostulou.

---

[21]See supra sec. I.C.2.d. of this report.

Petitioner has failed to prove a nontaxable source for any of the disagreed deposits.

4.    Conclusion

Petitioner underreported his gross income for the years in issue as follows:

| Year | Amount |
|------|--------|
| 1994 | $92,103 |
| 1995 | 141,790 |
| 1996 | 84,888 |

C.    Disallowed Deductions

Respondent disallowed for lack of substantiation $147,227, $197,739, and $183,762 claimed as other expenses on petitioner's Schedules C for 1994, 1995, and 1996, respectively.  For each year, a schedule attached to petitioner's Form 1040 shows other expenses to comprise miscellaneous expenses such as accounting, bank charges, business gifts, telephone, and the like.

Revenue Agent Barbati testified that, during his examination of petitioner's returns, petitioner produced no substantiation for any of his business expenses and he, Revenue Agent Barbati, could not tie checks produced pursuant to respondent's summonses to petitioner's claimed business expense deductions.  Nevertheless, because he believed that petitioner did incur expenses in connection with his dental business, and because he believed that, excluding the category "other expenses", the

total of expenses and cost of goods sold shown on the front of each of petitioner's Schedules C was reasonable, he allowed that sum. He denied the claimed other expense deductions, however, because he believed that included in that category could be expenses duplicating those he had allowed; for instance, dental lab fees that petitioner could have also claimed as materials and supplies, which are included in a cost of goods sold computation.

Section 162(a) allows a taxpayer to deduct "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". To be deductible, however, the taxpayer must substantiate the expenses. See sec. 6001; Higbee v. Commissioner, 116 T.C. 438, 440 (2001) ("the taxpayer bears the burden of substantiating the amount and purpose of the claimed deduction."). Certain expenses must satisfy both section 162 and the enhanced substantiation requirements of section 274(d).

Petitioner does not specifically address the many reported expenses categorized as other expenses. He proposes that we find that amounts on checks totaling $64,500 in 1994 were properly deductible for a security deposit and advance rent. Neither purpose would necessarily give rise to a present deduction. See, e.g., Williams v. Commissioner, T.C. Memo. 1998-93 ("A security deposit is not deductible, if at all, until the year actually forfeited."); Belli v. Commissioner,

T.C. Memo. 1989-403 ("in general, an advance rental payment made by a cash basis taxpayer is not deductible in the year paid but, rather must be apportioned over the entire lease term"). Petitioner has failed to show that on account of the described checks he is entitled to a deduction for 1994 greater than that already allowed by respondent.

Petitioner's testimony with respect to credit card charges for 1994 and 1996 may indicate deductible expenses, but he did not persuade us that those expenses were not included in the already allowed category of cost of goods sold. For 1995, petitioner failed to convince us that he could not have obtained a duplicate of the lost credit card statement for that year or that the claimed expenses were not duplicated in other, allowed categories on his 1995 Schedule C.

Given a lack of substantiation, respondent allowed what he thought to be reasonable amounts of expenses allocable to petitioner's dental business. We can go no higher with the evidence before us. We are not bound to do so under the so-called Cohan doctrine, which, if the enhanced substantiation requirements of section 274 do not apply, allows us to approximate the allowable amount of a deductible expense that the taxpayer cannot fully substantiate. See Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930).

Petitioner has failed to prove his entitlement to deduct any of the disallowed other expenses. We therefore sustain respondent's adjustments, disallowing those expenses of $147,227, $197,739, and $183,762, for 1994, 1995, and 1996, respectively.

D.    Conclusion

We sustain respondent's determinations of deficiencies in tax consistent with the underpayment amounts we have determined in this section II.

III.    Fraud Penalty

If the Commissioner establishes that any portion of an underpayment of tax is due to fraud, a penalty is imposed in "an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud." Sec. 6663(a). For purposes of determining the penalty amount, the entire underpayment is treated as attributable to fraud, unless the taxpayer shows by a preponderance of the evidence that part of the underpayment is not due to fraud. Sec. 6663(b).

We have found underpayments of tax due to fraud for each of the years in issue. Petitioner has chosen to deny fraud altogether and has not, except in general, argued for lesser culpability for any of the underpayments.[22] Petitioner

---

[22]On brief, petitioner concedes: "In the instant case the petitioner's lack of cooperation and his alleged understatement of income remain the only indication

(continued...)

has failed to show by a preponderance of the evidence that any part of any of the underpayments is not due to fraud.

We therefore sustain the section 6663(a) penalty for each of the years in issue.

Decision will be entered under

Rule 155.

---

[22](...continued)
that he intended to evade or defeat the tax. It would be equally compelling to conclude that the petitioner was negligent even grossly negligence [sic] in his dealings with the IRS."