# United States Tax Court

T.C. Memo. 2024-85

SCENIC TRUST, DENNIS SIMPSON, SPECIAL TRUSTEE,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

DENNIS LEE SIMPSON,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket Nos. 17749-21, 17771-21.          Filed September 5, 2024.

————

Dennis Lee Simpson (trustee), for petitioner in Docket. No. 17749-21.

Dennis Lee Simpson, pro se in Docket No. 17771-21.

*Kelley A. Blaine*, *Kimberly L. Clark*, *Janice B. Geier*, *Karen O. Myrick*, *Alex R. Halverson*, *Caitlin A. Homewood*, and *Brittany M. Reid*, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

BUCH, *Judge*: Mr. Simpson participated in a direct-mail subscription business for approximately two decades. The subscription business consisted of several related entities. Returns were filed for Mr. Simpson and his related entities for 2012 and 2013 (years in issue). More than three years after the filing of the 2012 and 2013 returns for Mr. Simpson and Scenic Trust (petitioners), the Commissioner issued

[*2] Notices of Deficiency to petitioners for the years in issue, determining income tax deficiencies, additions to tax, and civil fraud penalties. In so doing, the Commissioner relied on the fraud exception to the statute of limitations. Petitioners argue that the Commissioner's determinations are barred by the statute of limitations and, to a lesser extent, dispute the underlying adjustments.

Mr. Simpson previously argued, and the Court has held, that the 2013 return filed on his behalf was not a valid return. *Parducci v. Commissioner*, T.C. Memo. 2023-75. The Commissioner thereafter filed a First Amended Answer to Second Amended Petition in which he asserted a revised deficiency and additions to tax under section 6651(a)(1) and (2)[1] for failure to timely file and failure to timely pay, with the addition for failure to timely file being asserted at the increased rate of section 6651(f) for a fraudulent failure to file. The Commissioner also asserted an addition to tax for failure to make estimated tax payments under section 6654. The Commissioner later conceded the addition for failure to timely pay. And on brief, the Commissioner did not address the addition for failure to make estimated tax payments; we will also regard that addition as conceded.

The Commissioner has failed to establish by clear and convincing evidence that Mr. Simpson's 2012 return or Scenic Trust's 2012 or 2013 return was false or fraudulent with the intent to evade tax. As a result, the Commissioner's deficiency determinations for Mr. Simpson for 2012 and Scenic Trust for 2012 and 2013 are barred by the statute of limitations. The Commissioner has also failed to establish that Mr. Simpson's failure to timely file a tax return for 2013 was fraudulent. Therefore, although Mr. Simpson is liable for the addition to tax for failure to timely file, it is not at the increased rate for a fraudulent failure to file. Regarding the underlying deficiency for 2013, the Commissioner established the deficiency set forth in his First Amended Answer to Second Amended Petition, and Mr. Simpson did not establish any error in the Commissioner's determinations.

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C.), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are shown in U.S. dollars and rounded to the nearest dollar.

[*3]                    FINDINGS OF FACT

I.    *Mr. Simpson*

Mr. Simpson graduated from college in 1979. He earned his degree in psychology from California State University, Long Beach.

Mr. Simpson has worked in several industries. After graduating from college, he joined the Navy and became a helicopter pilot. He medically retired in 1990. After retiring, Mr. Simpson began working in the financial industry. He started as a commodity broker, working for Shearson Lehman and later Merrill Lynch. Around that same time, Mr. Simpson also became involved in the subscription business.

II.    *The Subscription Business*

"The subscription business" was a catch-all phrase used by Mr. Simpson and Jeffrey Hoyal[2] to describe a third-party direct mail subscription business that they operated from the mid-1990s to 2015. Mr. Simpson began working in the subscription business in the mid-1990s using various entities to provide customer service, data management, and direct mail marketing to customers. Mr. Hoyal later became involved in the business. During the years in issue, Mr. Simpson and Mr. Hoyal operated the subscription business as partners.

A.    *General Structure of the Subscription Business*

The subscription business had three major components that worked together cohesively: (1) mailing agents, (2) clearing entities, and (3) call centers. Mailing agents sent subscription requests, i.e., mailers, to customers across the United States. The mailers offered the customer a set price to subscribe or renew a subscription to a publication. When customers received mailers, they generally had three options: (1) accept the offer to subscribe to the periodical by sending back to the mailing agent a completed mailer and a form of payment; (2) call the number on the mailer to inquire about the subscription; or (3) do nothing and thereby decline the offer to subscribe. During the years in issue, the primary mailing agent was Liberty Publishers Service, Inc. (Liberty).[3]

---

[2] Mr. Hoyal is a party in related cases. *See* Docket Nos. 6791-20, 10830-20.

[3] Other relevant mailing agents included Orbital Publishing Group, Inc., and United Publisher's Exchange, Inc. These mailing agents, including Liberty, were owned by Henry Cricket Group, LLC (Henry Cricket).

[*4] The clearing entities submitted customer orders. If a customer accepted the offer provided in the mailer, thereby placing an order, the order was forwarded to a clearing entity for processing. The clearing entity processed the order by submitting the order and remitting payment to the publisher or other third-party clearing entity. Once the order was submitted, a publisher had the authority to accept or reject it. As with mailing agents, there were several clearing entities.

The last major component of the subscription business involved call centers. While they had many roles, they primarily handled customer complaints and inquiries related to the mailers. Call centers also processed orders placed in response to mailers. This included processing telephone and internet orders and payments made by customers.

### B.  *Entities Involved in the Subscription Business*

Mr. Simpson and Mr. Hoyal operated the subscription business through multiple related entities. They formed the entities to provide specific services, which mainly included acting as mailing agents, clearing entities, call centers, or payment distributors. They also formed entities to hold specific assets. During the years in issue, relevant entities included Reality Kats, LLC (Reality Kats),[4] Maximillian, Inc. (Maximillian), and Scenic Trust.

#### 1.  *Reality Kats*

Dennis Simpson formed Reality Kats as an Oregon limited liability company (LLC) on July 8, 2005.[5] Mr. Simpson was the manager and sole member of Reality Kats. During the years in issue, Scenic Trust reported Reality Kats on Schedules C, Profit or Loss From Business, filed with its tax returns. However, Mr. Simpson has maintained that he, not Scenic Trust, owned Reality Kats during the years in issue.

Mr. Simpson controlled Reality Kats. He made and monitored all important financial decisions for the entity. For example, he determined which transactions Reality Kats entered into, and he kept track of the amounts and timing of deposits into Reality Kats's bank accounts.

---

[4] Documents in the record contain a variety of spellings of Reality Kats. We make no finding as to which is the "correct" spelling, but we will follow the predominant spelling in the contemporaneous records.

[5] Mr. Simpson later converted Reality Kats to a California LLC.

**[*5]** Additionally, he controlled the amount and timing of payments made by Reality Kats.

Reality Kats entered into the following relevant transactions during the years in issue.

### a. *3922 Bellinger Lane Property*

Reality Kats sold a property at 3922 Bellinger Lane in Medford, Oregon, to David Lennon and his wife in 2011. Mr. Simpson signed the contract as manager of Reality Kats. Reality Kats sold the property for $2,990,000 to the Lennons on credit with a stated interest rate of zero.

### b. *14957 Encendido Property*

Reality Kats sold property at 14957 Encendido, San Diego, California, on May 1, 2013, for $626,874. The property had a cost basis of $302,667. On its return for 2013, Scenic Trust reported a capital gain of $324,207.

### c. *4184 Bellinger Lane Property*

Reality Kats sold property at 4184 Bellinger Lane in 2007 for $2 million. Its cost basis was $250,000. The sale was an installment sale and was paid in full in 2012.

### 2. *Maximillian*

Maximillian was an Oregon corporation organized on November 21, 2006, by or on behalf of Noel Parducci. Ms. Parducci was its nominal president and secretary of Maximillian. While on paper Ms. Parducci seemingly controlled Maximillian, in reality she was subordinate to Mr. Simpson and Mr. Hoyal, who directed the actions to be taken through the entity.

Maximillian had a vital role in the subscription business. Its responsibilities included tracking the financial operations of the subscription business, coordinating the flow of funds among the various entities, and disbursing profits to Mr. Simpson and Mr. Hoyal, mainly through their entities Reality Kats and Hoyal & Associates, Inc. (H&A), an S corporation jointly owned by Jeffrey and Lori Hoyal. In 2014, Maximillian and Reality Kats memorialized a consulting agreement that required Reality Kats to provide consulting services to Maximillian. The consulting agreement had an "as of" date of January 1, 2012, but

[*6] was not actually signed until 2014 for the purpose of showing the Internal Revenue Service (IRS) the intended flow of money.

### 3. *Scenic Trust*

Scenic Trust was an irrevocable trust formed by Mr. Simpson in 2006. Joesph Petrucelli drafted the Scenic Trust agreement (Trust Agreement). The Trust Agreement had a stated execution date of January 1, 2006, but the date accompanying the signature was January 3, 2006. It named Mr. Hoyal as trustee and its beneficiaries as "that class of individuals constituting my heirs at law." At the time the trust was formed, Mr. Simpson was not married, and he did not have any children. However, he married in 2008. Because of the marriage, Qili-Ye Simpson became the beneficiary of Scenic Trust during the years in issue. Mr. Simpson alleges that he was separated during the years in issue, but the record of these cases does not include any documentary evidence of a separation, such as a marital separation agreement being filed with a court of competent jurisdiction.

### a. *Mr. Hoyal's Role in Scenic Trust*

Mr. Hoyal was the trustee of Scenic Trust from 2006 to 2015. The Trust Agreement outlined his role and responsibilities as trustee. He had sole discretion to distribute income and principal to the beneficiaries of the trust. However, he could not distribute income to himself. Furthermore, he had the power to grant a general power of appointment to a beneficiary, but not to himself. Mr. Hoyal believed his role as trustee was to keep an eye on Scenic Trust since it ultimately belonged to Mr. Simpson.

### b. *Mr. Simpson's Role in Scenic Trust*

Within the terms of the Trust Agreement, Mr. Simpson did not have a role with Scenic Trust other than as the settlor. But those who interacted with Mr. Simpson or the trust viewed him as indistinguishable from Scenic Trust. Although he was not listed in the Trust Agreement as a beneficiary, those who interacted with him or the trust considered him to be the beneficiary. Furthermore, those who interacted with Mr. Simpson or the trust understood him to be the primary decision maker for all matters related to Scenic Trust.

**[\*7]**    c.  *Joseph Petrucelli*

Mr. Petrucelli is the managing partner of the San Diego office of Adkisson Pitet LLP. He has a law degree from California Western School of Law and an LL.M. in taxation from the University of San Diego Law School. Mr. Petrucelli has over 25 years of experience as a tax and estate planning attorney. He has published articles on private annuity agreements and a book about private annuity trusts.

Mr. Petrucelli was referred to Mr. Simpson to help him with estate planning and asset protection. Mr. Simpson hired Mr. Petrucelli to set up Scenic Trust. On December 28, 2005, Mr. Simpson received engagement materials for Mr. Petrucelli's representation. The materials included an engagement letter for Mr. Petrucelli's legal services, which included (1) drafting a beneficiary taxed trust; (2) drafting a dynasty trust; (3) drafting appropriate property transfer documents, including private annuities; (4) forming an LLC; and (5) engaging an actuary on behalf of Mr. Simpson to calculate annuity payments associated with the private annuity. The materials were executed sometime after late January 2006. Mr. Petrucelli did not receive any interest in any of the entities owned by Mr. Simpson or his trusts in exchange for his legal services.

    d.  *Agreements Entered Into During the Formation of Scenic Trust*

As part of the formation of Scenic Trust, a Private Annuity Agreement was executed between Mr. Simpson and Mr. Hoyal as trustee of Scenic Trust. The Private Annuity Agreement had an execution date of January 1, 2006. It designated Mr. Simpson as an annuitant for the sale of property to Scenic Trust. The property sold (Reality Kats units) was assigned a fair market value of $16,200,000.

Lastly, in connection with the formation of Scenic Trust and the execution of the Private Annuity Agreement, a Unit Purchase Agreement was executed between Mr. Simpson and Mr. Hoyal as trustee of Scenic Trust. The Unit Purchase Agreement had an execution date of January 15, 2006, but purported to have been signed on January 1 and 2. The Unit Purchase Agreement was intended to be read in connection with the Private Annuity Agreement. The Unit Purchase Agreement identified the property to be transferred as the 100 units of Reality Kats owned by Mr. Simpson. It further stated that the 100 units

**[\*8]** represented "100% of the LLC units of said company."[6] The property was transferred for an aggregate price of $16,200,000. This agreement was provided during discovery.

But a different Unit Purchase Agreement was provided to the Commissioner during the examination. This revised version had an execution date of January 15, 2006, with a signature date of January 1, 2006. The terms in the revised version were significantly different from those of the version provided in discovery. Mr. Simpson does not consider the revised agreement authentic. But he believed the Trust Agreement, the Private Annuity Agreement, and the version of the Unit Purchase Agreement provided during discovery to be authentic documents.

### C.      *Mr. Simpson's Role in the Subscription Business*

Mr. Simpson's role in the subscription business involved overseeing the mailing operations. Specifically, he oversaw nearly all aspects of the mailers, including developing the content of the mailers, identifying the types of potential customers to whom the mailers would be sent, and dictating where the mailers would be sent. Mr. Simpson perceived his services to be a key element in the subscription business. He provided those services to the subscription business through Reality Kats.

### D.      *Flow of Services and Payments Between Entities*

The subscription business had a general payment structure that involved entities' paying one another for services they provided to each other and deducting offsetting expenses. But in the making of these payments, money bounced from entity to entity. For example, during the years in issue, Liberty was the main operating entity of the subscription business. Mr. Simpson provided services to Liberty through Reality Kats. To pay for Mr. Simpson's services, Liberty would make payments to Henry Crickett, the entity that owned it, and characterize these payments as payments for consulting services. Henry Crickett would then make payments to Maximillian for the consulting services. The money in Maximillian would remain there until Ms. Parducci was instructed to transfer it to Reality Kats (or H&A if the payment was for Mr. Hoyal's services). This instruction could be in an email or an invoice. Ms. Parducci would transfer the money as instructed. And Mr. Simpson

---

[6] Mr. Simpson argues that the transfer of units did not constitute a complete sale of Reality Kats to Scenic Trust. The record does not support this argument.

[*9] would receive payment for his services through Reality Kats (and Mr. Hoyal through H&A). During the years in issue, Reality Kats and H&A received roughly equal transfers of money from Maximillian.

Notwithstanding the convoluted movement of funds, each entity that received payments for services reported the amounts received in its gross receipts. All of the wages Mr. Simpson received from Reality Kats during the years in issue were reported on the returns for those years.

III.  *Tax Returns*

While Scenic Trust filed tax returns for the years in issue, Mr. Simpson filed a tax return only for 2012. We previously held that the 2013 income tax return filed for Mr. Simpson was not signed by him or by someone authorized to sign on his behalf and thus was not a valid return. *See Parducci v. Commissioner*, T.C. Memo. 2023-75.

A.  *Mr. Ankerberg's Tax Return Preparation*

Curt Ankerberg, now retired, was a licensed certified public accountant who practiced for 33 years. Mr. Ankerberg worked at several accounting firms throughout his career. He prepared thousands of tax returns, gaining experience with individual returns, corporate returns, partnership returns, and trust returns. Although he prepared trust returns, he considered himself as having specialized in corporate, individual, and partnership returns. He prepared trust returns the least of the various types of returns he prepared. And even then, he mostly prepared returns for simple trusts, which were not technical and complex. But he was familiar with complex trusts and had prepared returns for those types of trusts before meeting the Hoyals.

Mr. Hoyal hired Mr. Ankerberg to prepare tax returns for the subscription business. At the time, Mr. Ankerberg had recently established his own accounting practice. Because of a noncompete agreement with his former accounting firm, he did not have any clients when he began his own accounting practice. To build up a client base, he purchased the address information for 7,000 names and sent out letters to prospective clients. Mr. Hoyal responded to the letter. By the end of 2005, Mr. Ankerberg's practice had already found some success by having Mr. Hoyal and entities related to the subscription business as clients.

Mr. Ankerberg prepared petitioners' tax returns from 2006 through 2014. Mr. Simpson was provided with copies of those returns.

**[\*10]**  B.  *The 95% Amortization*

During the years in issue, Scenic Trust "amortized" as an "application of annuity cost" 95% of the gross receipts of Reality Kats, its Schedule C activity. Reality Kats first claimed this 95% amortization on its 2006 return. On that return, it reported $4,321,390 in gross receipts and claimed 95% of that as an amortization deduction.

This 95% amortization is novel. There was much discussion among Mr. Hoyal, Mr. Petrucelli, and Mr. Ankerberg about how to use it. In March 2006, Mr. Ankerberg and Mr. Hoyal held a call with Mr. Petrucelli to discuss private annuity trusts. The purpose of the call was for Mr. Petrucelli to provide Mr. Ankerberg with the mechanics of how to prepare a tax return for an annuity trust because of Mr. Ankerberg's unfamiliarity with the concept. Mr. Petrucelli failed to explain to him how the annuity trust worked but advised Mr. Ankerberg to use the 95% amortization method on the returns. Mr. Ankerberg continued to use this 95% amortization method in subsequent years.

Mr. Simpson was not a part of the discussion surrounding the use of the 95% amortization method. At trial, Mr. Petrucelli testified that he did not recall any conversations with Mr. Hoyal, Mr. Ankerberg, or Mr. Simpson in which he advised them to use the 95% amortization method. Mr. Petrucelli was not credible.

C.  *Mr. Simpson's 2013 Return*

Mr. Ankerberg prepared a 2013 return for Mr. Simpson. He did not receive the information to prepare Mr. Simpson's return until October 15, 2014, the day on which the return was due. He did not provide that return directly to Mr. Simpson, and Mr. Simpson never signed that return or authorized anyone to sign it on his behalf. *See Parducci*, T.C. Memo. 2023-75.

IV.  *IRS Examination of Petitioners' and Related Entities' Returns*

The Commissioner examined the returns of Mr. Simpson, Scenic Trust, and other entities and individuals involved in the subscription business. During the examination, many of these entities and individuals, including petitioners, were represented by David Lennon. Mr. Lennon, a practicing attorney since 1988, worked as an attorney for the subscription business. Although he is primarily a commercial litigator, he has some tax litigation experience as well. In addition to his other work for the subscription business, Mr. Lennon represented all the

[*11] entities and individuals that were a part of the subscription business during litigation with the Federal Trade Commission over deceptive practices.

During the examination, petitioners and their related entities provided the Commissioner with extensive records. They provided organizational documents. They also provided their accounting records by providing QuickBooks files with general ledgers for various entities. They provided balance sheets, bank records, and receipts. They also provided returns of related entities.

Petitioners (or their advisors) also provided altered or backdated documents. The revenue agent received agreements that had stated execution dates that predated the dates the agreements were actually executed. These agreements included the consulting agreement between Maximillian and Reality Kats, the Trust Agreement, and a private annuity agreement between Scenic Trust and Mr. Simpson. Additionally, the revenue agent received more than one version of some documents, including two versions of a unit purchase agreement between Scenic Trust and Mr. Simpson. The two versions had very different terms and both were backdated. At no time during the audits of petitioners' or other related entities' returns was the revenue agent informed that documents were backdated or altered.

V.    *Novato Development, LLC*

Novato Development, LLC (Novato), was a real estate development company owned 50% by Crater Lake Trust,[7] and 50% by Mr. Simpson and Reality Kats. On December 12, 2019, the Commissioner issued a Notice of Final Partnership Administrative Adjustment (FPAA) to Novato. Because no petition for readjustment was filed with the Tax Court, the adjustments in that FPAA became final. The Commissioner reflected affected items from Novato as an "Additional Assessment" on Mr. Simpson's Notice of Deficiency for 2013.

VI.    *Penalty Approval*

While assigned to the examination of Scenic Trust's and Mr. Simpson's returns, the revenue agent requested from his supervisor approval for assertion of the fraud penalty and, in the alternative, the negligence penalty. The revenue agent's supervisor approved the fraud

---

[7] Crater Lake Trust is a party at issue in related cases. *See* Docket Nos. 6791-20, 10830-20.

**[\*12]** penalty and the alternative negligence penalty before the issuance of the Notices of Deficiency.

## VII.  *Notices of Deficiency and Concessions*

On July 6, 2021, the Commissioner issued Notices of Deficiency to petitioners for the years in issue. He determined the following deficiencies and penalties for Mr. Simpson:

|          |            | Additions to Tax/Penalties | | | |
|----------|------------|------------|------------|------------|------------|
| Year     | Deficiency | § 6663     | § 6651(f)  | § 6651(a)(2) | § 6654   |
| 2012     | $7,203,670 | $5,402,753 | —          | —          | —          |
| 2013[8]  | 2,495,267  | —          | $1,400,964 | $483,091   | $33,576    |

He determined the following deficiencies and penalties for Scenic Trust:

| Year | Deficiency | § 6663 Penalty |
|------|------------|----------------|
| 2012 | $6,363,735 | $4,772,801     |
| 2013 | 1,337,331  | 1,002,998      |

Petitioners timely filed Petitions with the Court. They disputed the Commissioner's determinations and argued that the Commissioner's adjustments in the notices of deficiency were barred by the applicable statute of limitations. When the Petitions were filed, Mr. Simpson resided in California and Scenic Trust's principal place of administration was also in California.

## VIII.  *Trial*

The Court tried these cases in December 2023. At trial, the Court heard testimony from several witnesses, including Ms. Parducci, Mr. Petrucelli, Mr. Ankerberg, Mr. Lennon, the revenue agent, Mr. Simpson,

---

[8] The 2013 amounts are derived from the Commissioner's First Amended Answer to Second Amended Petition, filed after the Court held that Mr. Simpson's 2013 return was not a valid return.

[*13] the Hoyals, and others. We found the testimony of several witnesses helpful in understanding the mechanics of the subscription business. We also found testimony from certain witnesses conflicting and not credible, particularly Mr. Simpson's. For example, Mr. Simpson testified that he had no control over any of the entities that made up the subscription business other than Reality Kats. But witnesses other than Mr. Simpson testified consistently that he was involved with, or informed of, most of the decisions made regarding Scenic Trust and Reality Kats. In short, Mr. Simpson's testimony was not credible.

Before trial, the parties conceded many issues. After concessions, the following issues remained: (1) whether the period of limitations to assess tax against petitioners for 2012 and Scenic Trust for 2013 expired before the Commissioner issued the Notices of Deficiency; (2) whether the taxable items reported on Scenic Trust's returns for the years in issue were accurately reported and should be attributed to Mr. Simpson; (3) whether Scenic Trust is liable for a section 6663 fraud penalty, or alternatively a section 6662(a) accuracy-related penalty, for the years in issue; (4) whether Mr. Simpson is liable for a section 6663 fraud penalty, or alternatively a section 6662(a) accuracy-related penalty, for 2012; (5) whether Mr. Simpson is liable for an addition to tax for 2013 for failure to timely file, failure to timely pay, and failure to make estimated tax payments, including whether the failure to file addition applies at the increased rate for a fraudulent failure to file; and (6) whether Mr. Simpson's participation in the operations of Novato constituted material participation under section 469.

OPINION

These consolidated cases involve the flow of income between two taxpayers and their related entities for tax years 2012 and 2013. The principal issues we must decide are (1) whether Scenic Trust's and Reality Kats's income should be reattributed to Mr. Simpson for the years in issue; (2) whether the Commissioner's deficiency determinations for petitioners were correct; and (3) whether petitioners are subject to additions to tax or penalties for the years in issue based on the Commissioner's determinations. But before we decide these issues, we must first address a preliminary issue, which is whether the periods of limitations to make assessments against Mr. Simpson for 2012 and Scenic Trust for 2012 and 2013 expired before the Commissioner issued Notices of Deficiency. If the periods expired before the notices were issued, we need to decide only adjustments related to Mr. Simpson's 2013 tax return. However, if the periods of limitations

**[*14]** had not expired, we must determine adjustments for each petitioner for each year in issue.

I.   *Statute of Limitations*

Section 6501(a) provides that the Commissioner must generally assess tax within three years after a return is filed. However, if a taxpayer files "a false or fraudulent return with the intent to evade tax, the tax may be assessed . . . at any time." I.R.C. § 6501(c)(1). "Fraud for this purpose is defined as intentional wrongdoing by the taxpayer with the specific purpose of avoiding tax believed to be owed." *Fabian v. Commissioner*, T.C. Memo. 2022-94, at *25.

The Commissioner issued Notices of Deficiency to petitioners on July 6, 2021, more than three years after the relevant returns were filed. He relies on section 6501(c)(1) to keep the periods of limitations open. The Commissioner argues that the periods to assess income tax due from petitioners for 2012 and 2013 have not expired because he has established fraud by clear and convincing evidence. Petitioners disagree, arguing that fraud has not been established and therefore the periods of limitations have expired.

As a preliminary matter, we note that this statute of limitations question is not presented for Mr. Simpson's 2013 liability. In *Parducci*, T.C. Memo. 2023-75, Mr. Simpson argued, and we held, that his 2013 return was not signed by him or by anyone authorized by him. As a result, we held that Mr. Simpson's 2013 return was not a valid return. This leaves Mr. Simpson without a valid return for 2013. Under section 6501(a) and (c)(3), when no return is filed, the Commissioner may assess at any time. Accordingly, the period of limitations on assessment has not lapsed as to the Commissioner's determinations regarding Mr. Simpson's 2013 tax liability. The remainder of this discussion of the periods of limitations pertains to Mr. Simpson's liability for 2012 and Scenic Trust's liabilities for 2012 and 2013.

A.   *Proof of Fraudulent Return*

The Commissioner must establish fraud by clear and convincing evidence. I.R.C. § 7454(a); Rule 142(b); *Botwinik Bros. of Mass., Inc. v. Commissioner*, 39 T.C. 988, 996 (1963). The existence of fraud is a question of fact to be resolved by considering the entire record. *Clark v. Commissioner*, T.C. Memo. 2021-114, at *36–37. The determination of fraud for purposes of determining whether a taxpayer filed a fraudulent return under section 6501(c) is the same as the determination of fraud

**[\*15]** for purposes of the civil fraud penalty under section 6663. *Browning v. Commissioner*, T.C. Memo. 2011-261, 102 T.C.M. (CCH) 460, 467.

To establish fraud, the Commissioner must prove two elements by clear and convincing evidence: (1) an underpayment of tax and (2) fraudulent intent with respect to some portion of that underpayment. *DeVries v. Commissioner*, T.C. Memo. 2011-185, 102 T.C.M. (CCH) 125, 128. The Commissioner satisfies the clear and convincing evidence standard when he provides proof that produces "in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Garavaglia v. Commissioner*, T.C. Memo. 2011-228, 102 T.C.M. (CCH) 286, 302 (quoting *Ohio v. Akron Ctr. for Reprod. Health*, 497 U.S. 502, 516 (1990)), *aff'd*, 521 F. App'x 476 (6th Cir. 2013). This standard "is intermediate, being more than a mere preponderance, but not the extent of such certainty as is required beyond a reasonable doubt in criminal cases. It does not mean clear and unequivocal." *Id.* The Commissioner's burden applies separately for each of the years in issue. *Castillo v. Commissioner*, 84 T.C. 405, 409 (1985). Once fraud is established, the entire taxable year remains open under section 6501(c)(1) even if only a part of the underpayment for a year is attributable to fraud. *Browning*, 102 T.C.M. (CCH) at 467. Likewise, if the Commissioner establishes that part of an underpayment is due to fraud, the entire underpayment is treated as attributable to fraud for penalty purposes, except to the extent the taxpayer establishes otherwise. I.R.C. § 6663(b).

1.   *Fraudulent Intent*

To find fraud, we must consider whether the return was prepared with intent to evade tax believed to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of tax. *DiLeo v. Commissioner*, 96 T.C. 858, 874 (1991), *aff'd*, 959 F.2d 16 (2d Cir. 1992). Because direct evidence of intent to evade tax is rarely available, intent may be proved by circumstantial evidence and reasonable inferences from facts. *Fabian*, T.C. Memo. 2022-94, at \*26. Courts have developed a nonexclusive list of indicia or "badges" of fraud to describe behavior that may indicate fraudulent intent. *Niedringhaus v. Commissioner*, 99 T.C. 202, 211 (1992); *Clark*, T.C. Memo. 2021-114, at \*37. The existence of any one indicium is not dispositive, but multiple indicia together are strong circumstantial evidence of fraudulent intent. *Niedringhaus*, 99 T.C. at 211.

**[\*16]** Badges of fraud include, but are not limited to: (1) failing to file tax returns, (2) understating income, (3) maintaining inadequate records, (4) giving implausible or inconsistent explanations of behavior, (5) failing to cooperate with tax authorities, (6) concealing income or assets, (7) engaging in illegal activities, (8) demonstrating a lack of credibility in testimony, (9) filing false documents (including false tax returns), (10) dealing in cash, and (11) an intent to mislead which may be inferred from a pattern of conduct. *Id.*

Most of these badges are neutral or weigh against a finding of fraud in these cases. In considering what facts support the presence of these various badges, we decline to find that a single act supports multiple badges. Therefore, we conclude that the Commissioner has failed to establish that petitioners for 2012, and Scenic Trust for 2013, acted with the requisite fraudulent intent when filing their returns for the years in issue.

### a. *Badges Indicating Fraud*

The Commissioner has established the following badges of fraud were present.

### i. *Lack of Credible Testimony*

Overall, Mr. Simpson's testimony at trial was not credible. For example, he downplayed his role in the subscription business despite the evidence showing that he and Mr. Hoyal operated the subscription business as partners. Mr. Simpson also claimed that he lacked knowledge about various transactions entered into by entities he controlled. And he pointed to Mr. Hoyal and others as misleading him. But both the testimony of other witnesses and contemporaneous documents showed that Mr. Simpson was very involved with and kept informed about the subscription business. This conduct supports a finding of fraud.

### ii. *Intent to Mislead Inferred from Pattern of Conduct*

The Commissioner argues that petitioners engaged in a pattern of conduct to mislead by (1) presenting altered or backdated documents; (2) hiding behind confusing narratives; and (3) attacking the Hoyals.

Petitioners engaged in a pattern of conduct with an intent to mislead, primarily by providing altered documents to the Commissioner.

**[*17]** During examination, the revenue agent was presented with altered documents. This conduct shows an intent to mislead and supports a finding of fraud.

We note, however, that the Commissioner cites the altered documents as support for the existence of conduct described by several badges. Although we believe that the altered documents support a finding of intent to mislead, we decline to use a single act or event to support multiple badges. Therefore, we will address the altered documents only under this specific badge.

### b. *Badges Not Indicating Fraud*

As previously stated, most of the badges are neutral or weigh against a finding of fraud here. By relying on the same facts to establish multiple badges of fraud, the Commissioner has failed to establish the existence of the following badges.

### i. *Failing to File Tax Returns*

Scenic Trust filed returns for the years in issue. Furthermore, Mr. Simpson filed a tax return for 2012. This badge weighs against fraud.

### ii. *Understating Income*

A pattern of substantially underreporting income over several successive years can be strong evidence of fraudulent intent. *See Zhadanov v. Commissioner*, T.C. Memo. 2002-104, 83 T.C.M. (CCH) 1553, 1560. Such a pattern evidences fraudulent intent "even where the record is 'devoid of the usual indicia of fraud.'" *Isaacson v. Commissioner*, T.C. Memo. 2020-17, at *48–49 (quoting *Otsuki v. Commissioner*, 53 T.C. 96, 107–08 (1969)), *aff'd*, No. 20-71121, 2022 WL 541617 (9th Cir. Feb. 23, 2022).

The Commissioner's support for this badge is predicated on the Court's adoption of his position that the income of Reality Kats and Scenic Trust should be reattributed to Mr. Simpson. When the relevant returns are considered as a group, however, there is no pattern of understating income. This badge is neutral.

### iii. *Maintaining Inadequate Records*

Taxpayers must maintain records sufficient for the Commissioner to determine their tax liability. I.R.C. § 6001. Failing "to keep or produce

**[\*18]** adequate records to support . . . tax return positions" is an indicator of fraud. *Scott v. Commissioner*, T.C. Memo. 2012-65, 103 T.C.M. (CCH) 1310, 1317. For this badge the Commissioner states that "[t]he evidentiary record in this case is replete with examples of Mr. Simpson's idiosyncratic and ends-driven curation of records. It would be simpler to list the authentic records that Mr. Simpson maintained and produced, than to list any portion of the confused amalgam produced at trial."

But the Commissioner is mistaken. The evidence in the record does not clearly show that Mr. Simpson failed to maintain adequate records. In the evidentiary record, we have (1) petitioners' tax returns; (2) profit and loss statements for Reality Kats and Scenic Trust for 2013; (3) balance sheets and bank records for Reality Kats and Scenic Trust; and (4) receipts, deeds, invoices, and other transactional statements to substantiate certain transactions and expenses. While the Commissioner disagrees with how items were reported, petitioners provided enough documentation to reconcile their reporting on their tax returns. This badge weighs against fraud.

iv.     *Implausible or Inconsistent Explanations of Behavior*

A taxpayer's implausible or inconsistent explanations for his actions may constitute evidence of fraudulent intent. *See Bradford v. Commissioner*, 796 F.2d 303, 307 (9th Cir. 1986), *aff'g* T.C. Memo. 1984-601. "We may consider a taxpayer's filings and testimony as evidence of implausible or inconsistent explanations." *Di Giorgio v. Commissioner*, T.C. Memo. 2023-44, at \*25. The Commissioner argues that Mr. Simpson's implausible or inconsistent explanations of behavior include (1) Mr. Simpson's sending an email asking whether he could use Reality Kats funds to purchase a lot to build a house; (2) Mr. Simpson's being included on an email chain that stated he and Mr. Hoyal were in Mr. Lennon's office waiting to sign revised Scenic Trust documents; (3) Mr. Simpson's being included on an email chain that stated that Mr. Lennon planned on not pointing out to the revenue agent Scenic Trust's true basis in a property sold unless there was further inquiry; and (4) correspondence between Mr. Lennon and Mr. Petrucelli in which they state that they need to find a relationship to explain the flow of money though the subscription business.

These examples are not sufficient to support a finding that Mr. Simpson provided implausible or inconsistent explanations of behavior.

**[\*19]** The most implausible or inconsistent explanation of behavior is Mr. Simpson's not recalling revisions to documents while also being included in an email that stated that he was in Mr. Lennon's office to sign Scenic Trust documents. But Mr. Simpson has maintained that until recently he believed the revisions to the Scenic Trust documents were to clean up typos, which would easily be unremarkable and forgettable after more than a decade had passed. This badge is neutral.

v. *Failing to Cooperate with Tax Authorities*

A taxpayer's failure to cooperate with tax authorities, including a failure to cooperate with revenue agents during an examination, can indicate fraudulent intent. *Grosshandler v. Commissioner*, 75 T.C. 1, 19–20 (1980). The Commissioner argues that petitioners failed to cooperate during the examination by (1) producing false or misleading documents and (2) failing to inform the revenue agent that Scenic Trust inaccurately reported gain on the sale of property.

Petitioners cooperated during the audit. The Commissioner received adequate information and documentation regarding petitioners and other entities involved in the subscription business. And while petitioners failed to inform the revenue agent about an inaccurate reporting of gain from the sale of property, that incident alone is not sufficient to establish that petitioners failed to cooperate. This badge is neutral.

vi. *Concealing Income or Assets*

If a taxpayer conceals his ownership of assets or covers up sources of income, such concealment supports a finding of fraud. *Spies v. United States*, 317 U.S. 492, 499 (1943). The Commissioner argues that Mr. Simpson attempted to conceal the true characteristics of his tax liability by presenting altered or backdated documents, hiding behind confusing narratives, and attacking the Hoyals.

But petitioners did not attempt to conceal income or assets. Petitioners provided records that showed where income came from, where income went, and where assets were held. Furthermore, the records supported positions taken on petitioners' returns. While the flow of income was convoluted, we do not find an intent to conceal income or assets. This badge weighs against fraud.

[*20]                                   vii.   *Engaging in Illegal Activities*

The Commissioner does not argue, and the record does not support, that petitioners engaged in illegal activities. This badge is neutral.

viii.   *Filing False Documents*

The Commissioner does not argue, and the record does not support, that petitioners filed false documents. This badge is neutral.

ix.   *Dealing in Cash*

Petitioners did not deal in cash. This badge is neutral.

c.   *Badges of Fraud Conclusion*

After considering the entire record, we conclude that the Commissioner has failed to provide clear and convincing evidence that petitioners filed fraudulent tax returns. While the Commissioner presented evidence potentially supporting a finding of fraud, specifically, Mr. Simpson's lack of credibility and the existence of altered and backdated documents, those badges alone are not sufficient to establish fraudulent intent by clear and convincing evidence. The Commissioner has not carried his burden for establishing fraud.

2.   *Underpayment of Tax*

Because the Commissioner has not established fraud by clear and convincing evidence, we need not determine whether there were underpayments of tax as part of our fraud analysis.

B.   *Statute of Limitations Conclusion*

The Commissioner has failed to provide clear and convincing evidence that petitioners filed false or fraudulent returns with the intent to evade tax. Thus, the extended period of limitations provided in section 6501(c) does not apply. Accordingly, the Commissioner's determinations and adjustments relating to petitioners for 2012 and Scenic Trust for 2013 are barred by the statute of limitations.

II.   *Mr. Simpson's 2013 Return*

The Commissioner determined a tax deficiency and, by amended Answer, additions to tax for failure to timely file and failure to timely

**[\*21]** pay. Because Mr. Simpson did not file a return for 2013, the period of limitations has not expired, and we turn to those issues.

### A.     *Deficiency*

#### 1.     *Income*

##### a.     *Burden of Proof and Production*

Generally, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving error. Rule 142(a)(1); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). With respect to any new matter or increases in deficiency pleaded in an answer, the burden is on the Commissioner. Rule 142(a)(1). In the U.S. Court of Appeals for the Ninth Circuit, the court to which these cases would be appealable absent stipulation otherwise, determinations of unreported income must be supported by a "minimal evidentiary foundation" before the presumption of correctness applies. *Weimerskirch v. Commissioner*, 596 F.2d 358, 361 (9th Cir. 1979), *rev'g* 67 T.C. 672 (1977); *see Golsen v. Commissioner*, 54 T.C. 742, 756–58 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971). "[T]he Commissioner must offer some substantive evidence showing that the taxpayer received income from the charged activity." *Weimerskirch v. Commissioner*, 596 F.2d at 360. "After the Commissioner produces evidence linking the taxpayer to an income-producing activity, the burden shifts to the taxpayer to prove the determinations are arbitrary or erroneous." *Estate of Clemons v. Commissioner*, T.C. Memo. 2022-95, at \*16. To carry this burden, Mr. Simpson must show that the income the Commissioner determined derived from a nontaxable source or was otherwise excludable from income. *See id.*

##### b.     *Attribution of Income*

The Commissioner argues that Mr. Simpson is liable for the taxable items assigned to Reality Kats and Scenic Trust by application of the assignment of income doctrine, grantor trust rules, or sham-trust doctrine. We agree with the Commissioner.

###### i.     *Assignment of Income Doctrine*

The Commissioner argues that Reality Kats's items of income should be reattributed to Mr. Simpson pursuant to the assignment of income doctrine.

**[\*22]** The assignment of income doctrine prevents an individual from avoiding tax on income by assigning that income to another person or entity. *Anyanwu v. Commissioner*, T.C. Memo. 2014-123, at \*13; *see also Lucas v. Earl*, 281 U.S. 111, 114–15 (1930). Under this doctrine, income is taxed to the person who actually earns it. *United States v. Basye*, 410 U.S. 441, 450 (1973); *see also Anyanwu*, T.C. Memo. 2014-123, at \*13 ("[I]ncome is taxable to . . . the one who owns the tree on which the fruit grows."). Furthermore, a person who "earns income may not avoid taxation through anticipatory arrangements no matter how clever or subtle." *Basye*, 410 U.S. at 450.

Reality Kats's income is taxable to Mr. Simpson. Reality Kats was a single-member LLC, and Mr. Simpson has consistently held himself out as its owner. He had total control over every financial decision and transaction that occurred within the entity. The Commissioner linked Mr. Simpson with the activity of Reality Kats. And the evidence shows that, although being characterized as merely the settlor of the trust per the Trust Agreement, Mr. Simpson had full control of the trust.

ii.    *Grantor Trust Rules*

The Commissioner argues that Scenic Trust's items of income should be reattributed to Mr. Simpson pursuant to the grantor trust rules. The grantor trust rules apply where "a grantor has transferred property to a trust but has not parted with complete dominion and control over the property or the income which it produces." *Scheft v. Commissioner*, 59 T.C. 428, 430 (1972). Section 671 provides that if a grantor or other person is treated as the owner of any portion of a trust,

> there shall then be included in computing the taxable income and credits of the grantor or the other person those items of income, deductions, and credits against tax of the trust which are attributable to that portion of the trust to the extent that such items would be taken into account under this chapter in computing taxable income or credits against the tax of an individual.

A grantor or other person will be treated as the owner of all or a portion of a trust if any one of the circumstances enumerated in sections 673 through 678 is satisfied. Treas. Reg. § 1.671-1(a). We will focus only on whether the circumstance set out in section 677 applies. Section 677 provides:

**[\*23]** The grantor shall be treated as the owner of any portion of a trust, whether or not he is treated as such owner under section 674, whose income without the approval or consent of any adverse party is, or, in the discretion of the grantor or nonadverse party, or both, may be . . . distributed to the grantor or the grantor's spouse . . . [or] held or accumulated for future distribution to the grantor or the grantor's spouse.

I.R.C. § 677(a)(1) and (2). Essentially, a grantor will be treated as an owner of any portion of a trust if in the discretion of the grantor, the grantor's spouse, or a nonadverse party, income is distributed or held for future distribution to the grantor or the grantor's spouse without the approval or consent of any adverse party other than the grantor's spouse. I.R.C. § 672(e); Treas. Reg. § 1.677(a)-1(b)(2)(i) and (ii).

a) *Whether Mr. Hoyal Was an Adverse Party*

The parties disagree about whether Mr. Hoyal, as trustee, was a nonadverse party for purposes of section 677. A nonadverse party is any person who is not an adverse party. I.R.C. § 672(b). An adverse party is defined as "any person having a substantial beneficial interest in the trust which would be adversely affected by the exercise or nonexercise of the power which he possesses respecting the trust." I.R.C. § 672(a). "A person having a general power of appointment over the trust property is deemed to have a beneficial interest in the trust." Treas. Reg. § 1.672(a)-1(a). And a beneficial interest is substantial "if its value in relation to the total value of the property subject to the power is not insignificant." *Id.* A trustee does not automatically have a substantial beneficial interest in a trust. *Id.*

The Commissioner argues that Mr. Hoyal is not an adverse party because he did not have a beneficial interest in the trust. Specifically, the Trust Agreement did not grant him a power of appointment or the right to share in the income or property of the trust. However, we are not confined to the Trust Agreement to determine whether Mr. Hoyal was an adverse party. Mr. Simpson disagrees. He argues that Mr. Hoyal had a beneficial interest in Scenic Trust because he engaged in fraud to enrich himself with Scenic Trust assets. The record does not support Mr. Simpson's argument.

**[\*24]** Mr. Hoyal was not an adverse party. The Trust Agreement granted him no rights to Scenic Trust's income or property. Neither was he granted a power of appointment. And looking beyond the Trust Agreement, Mr. Hoyal discussed most, if not all, Scenic Trust decisions with Mr. Simpson. He did not take any action without the explicit or implicit approval of Mr. Simpson. Furthermore, every decision was made for the benefit of Mr. Simpson. Therefore, Mr. Hoyal would not be adversely affected by the exercise or nonexercise of his powers as trustee of Scenic Trust.

b) *Whether Scenic Trust's Beneficiary During the Years in Issue Is Treated as Mr. Simpson's Spouse*

During the years in issue, Mrs. Simpson was the beneficiary of Scenic Trust. Pursuant to section 677, income distributed to her or held for future distribution to her is likewise considered to be distributed or held for Mr. Simpson unless they were legally separated. *See* I.R.C. § 672(e)(2); *Vercio v. Commissioner*, 73 T.C. 1246, 1258 (1980). Individuals are determined to be legally separated, and thus not determined to be married for purposes of section 677, when there is a divorce decree or separate maintenance filing. I.R.C. § 672(e)(2).

Mr. Simpson failed to provide sufficient evidence to establish that he was legally separated during 2013. He points to a marital separation agreement for support. But we have no record of this agreement's being filed with any court. Therefore, we treat Mrs. Simpson as Mr. Simpson's spouse for purposes of section 677 for 2013.

c) *Conclusion*

Mr. Hoyal was a nonadverse party who had discretion to distribute, or accumulate for future distribution, trust income or property to Mr. Simpson's spouse during the years in issue. Therefore, Mr. Simpson is treated as the owner of Scenic Trust. *See* I.R.C. § 677(a). Consequently, we need not address the sham-trust doctrine.

c. *Specific Items of Income*

i. *Imputed Interest Income*

The Commissioner determined and established imputed interest income of $54,442 for Mr. Simpson. This determination was based on

**[\*25]** Reality Kats's sale of 3922 Bellinger for payments over time but with a stated interest rate of zero. Mr. Simpson did not offer any argument or evidence to dispute the Commissioner's determination. Accordingly, we sustain the Commissioner's determination.

### ii.    *Taxable Interest Income*

The Commissioner determined and established taxable interest income of $221,078 for Mr. Simpson. This amount included interest income from transactions entered into by Scenic Trust and interest income unreported by Mr. Simpson. Mr. Simpson did not offer any argument or evidence to dispute the Commissioner's determination. Accordingly, we sustain the Commissioner's determination.

### iii.    *Reality Kats's Gross Receipts*

The Commissioner determined and established gross receipts of $3,638,540 as taxable to Mr. Simpson. This amount included Reality Kats's gross income reported for 2013 and the gain resulting from Reality Kats's sale of 14957 Encendido. Mr. Simpson did not offer any argument or evidence to dispute the Commissioner's determination. Accordingly, we sustain the Commissioner's determination.

### iv.    *Schedule C2 Gross Receipts*

The Commissioner determined and established additional gross receipts of $480,968 for Mr. Simpson. This amount reflected unreported bank deposits and cash payments.

Bank deposits are prima face evidence of the receipt of income, and the taxpayer bears the burden of proving that the Commissioner's determination of unreported income based on the bank deposits is incorrect. *Parks v. Commissioner*, 94 T.C. 654, 658 (1990). Mr. Simpson disputes this amount, stating that he explained to the Commissioner that the deposits constituted equity transfers between personal accounts or loan principal repayments. However, Mr. Simpson's statement did not direct the Court to any supporting documents at trial or on brief. Accordingly, we sustain the Commissioner's determination.

### v.    *Dividends*

The Commissioner determined and established qualified dividend income of $984 and ordinary dividend income of $31 for Mr. Simpson. These determinations reflected the amounts shown on Scenic Trust's

**[\*26]** Form 1099–DIV, Dividends and Distributions, reported by Morgan Stanley. Mr. Simpson did not offer any argument or evidence to dispute the Commissioner's determination. Accordingly, we sustain the Commissioner's determination.

### vi. *Royalties*

The Commissioner determined and established royalty income of $1,042 for Mr. Simpson. This determination reflected the amount shown on Mr. Simpson's Form 1099–MISC, Miscellaneous Income, reported by Continental Resources, Inc. Mr. Simpson did not offer any argument or evidence to dispute the Commissioner's determination. Accordingly, we sustain the Commissioner's determination.

### vii. *Rents*

The Commissioner determined and established rental income of $58,437 from 355 Industrial Circle for Mr. Simpson. In 2013, Scenic Trust rented out the property and received rents. Mr. Simpson did not offer any argument or evidence to dispute the Commissioner's determination. Accordingly, we sustain the Commissioner's determination.

### viii. *Wages*

In 2013, Mr. Simpson received from Reality Kats wages of $1,556,976. Because Reality Kats's income should be reattributed to Mr. Simpson, $1,556,976 should be credited against Reality Kats's reattributed gross receipts.

### 2. *Deductions*

Taxpayers bear the burden of proving that they are entitled to claimed deductions and credits. Rule 142(a); *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). Carrying that burden requires the taxpayer to "substantiate the nature, amount, and purpose of a claimed deduction." *Sezonov v. Commissioner*, T.C. Memo. 2022-40, at \*4. In limited situations, the burden may shift to the Commissioner under section 7491(a). The record does not support shifting the burden to the Commissioner.

Mr. Simpson did not establish his entitlement to any deductions for 2013 beyond those allowed in the Commissioner's First Amended Answer to Second Amended Petition. Although he claimed itemized

**[\*27]** deductions on his since-disavowed 2013 return, the Commissioner disallowed those deductions in his Notice of Deficiency. And Mr. Simpson did not offer evidence to substantiate or otherwise support any deductions beyond those allowed.

3. *Novato*

Affected items that require partner level determinations may be determined in deficiency proceedings. I.R.C. § 6230(a)(2)(A)(i) (TEFRA); I.R.C. § 6231(a)(5) (TEFRA); *Estate of Quick v. Commissioner*, 110 T.C. 172, 183 (1998). We have held "that the characterization of losses as either passive or nonpassive in the hands of a partner is an affected item under section 469." *Estate of Quick*, 110 T.C. at 188. The Commissioner asks us to determine whether Mr. Simpson's participation in Novato constituted passive activity under section 469.

Section 469 prevents a taxpayer from using passive losses to offset nonpassive income. *Lamas v. Commissioner*, T.C. Memo. 2015-59, at \*27. Passive activity is defined as activity that involves the conduct of any trade or business in which the taxpayer does not materially participate. I.R.C. § 469(c). Taxpayers materially participate if they are involved in the operations of the trade or business on a regular, continuous, and substantial basis. I.R.C. § 469(h)(1). The Treasury regulations set forth seven tests to determine whether a taxpayer materially participated. Temp. Treas. Reg. § 1.469-5T(a). And a taxpayer needs to satisfy only one of the tests. *Lamas*, T.C. Memo. 2015-59, at \*28.

Mr. Simpson did not put forth evidence (at trial or in his brief) showing that he materially participated in Novato. Thus, Novato was a passive activity for Mr. Simpson.

B. *Section 6651(f) Addition to Tax*

Mr. Simpson did not file a tax return for 2013. Sections 6011 and 6012 require every individual who has gross income above certain amounts for a taxable year to file an income tax return. Section 6651(a)(1) provides for an addition to tax for failure to file a timely return, equal to 5% of the amount required to be shown as tax on the return, for each month or fraction thereof during which such failure continues, not exceeding 25% in the aggregate. If, however, the failure to file any return is fraudulent, section 6651(f) imposes an increased addition to tax equal to 15% of the amount required to be shown as tax on the return for each month or fraction thereof during which such

**[\*28]** failure continues, not exceeding 75% in the aggregate. The Commissioner has determined that Mr. Simpson's failure to file for 2013 was fraudulent.

In ascertaining whether a taxpayer's failure to file was fraudulent under section 6651(f), the Court considers the same elements that are considered in imposing the fraud penalty under section 6663. *Clayton v. Commissioner*, 102 T.C. 632, 653 (1994). Those two elements of fraud are (1) the existence of an underpayment and (2) fraudulent intent with respect to some portion of the underpayment. *See Mohamed v. Commissioner*, T.C. Memo. 2013-255, at \*17–18. The existence of an underpayment is not in question here because we have determined that the income of Reality Kats and Scenic Trust should be reattributed to Mr. Simpson.

To establish fraudulent intent under section 6651(f), we consider the badges of fraud and whether they establish that Mr. Simpson deliberately failed to file his 2013 return, knowing that, by doing so, he was concealing the fact that he had income subject to tax. *See Mohamed*, T.C. Memo. 2013-255, at \*21.

This Court has previously decided this issue on facts similar to those here. In *Mohamed*, T.C. Memo. 2013-255, at \*4–5, \*12–13, a taxpayer's 2007 return was considered invalid because it was signed by the taxpayer's business partner who did not have authority to sign on the taxpayer's behalf. The Commissioner determined a section 6651(f) addition to tax for fraudulent failure to file for the taxpayer. *Mohamed*, T.C. Memo. 2013-255, at \*16. In finding that the taxpayer's failure to file was not fraudulent, we held:

> While the evidence may be sufficient to find that [the taxpayer] *intended* to file a fraudulent return for 2007 . . . but failed to do so, the evidence is insufficient for us to conclude that [the taxpayer] employed [his business partner] in a deliberate attempt to file a purported return that, if respondent examined it and charged him with fraudulent underpayment of tax, [the taxpayer] could then disavow.

*Id.* at \*30–31. As in *Mohamed*, a return was filed for Mr. Simpson's 2013 tax year, but it was not signed by him or someone authorized to sign on his behalf. And as in *Mohamed*, nothing in the record establishes that Mr. Simpson had someone sign his 2013 return without official

**[*29]** authorization so that if the Commissioner examined it, Mr. Simpson could later disavow it. The Commissioner has failed to establish that Mr. Simpson's failure to file his 2013 return was fraudulent. As a result, the addition to tax for failure to file applies, but not at the increased rate for a fraudulent failure to file.

III.    *Conclusion*

The Commissioner has failed to provide clear and convincing evidence that petitioners filed fraudulent returns. Thus, the extended period of limitations provided in section 6501(c) does not apply. Accordingly, the Commissioner's determinations and adjustments relating to Mr. Simpson's 2012 tax year and Scenic Trust's 2012 and 2013 tax years are barred by the statute of limitations. But because he did not file a valid return for 2013, the period of limitations to assess tax for Mr. Simpson remains open for that year.

The Commissioner has failed to establish by clear and convincing evidence that Mr. Simpson fraudulently failed to file his 2013 return. Therefore, the section 6651(f) addition to tax does not apply. The Commissioner has otherwise established the determinations for 2013 as set forth in his First Amended Answer to Second Amended Petition. Accordingly, Mr. Simpson is liable for an income tax deficiency for 2013 and an addition to tax for failure to timely file under section 6651(a)(1).

To reflect the foregoing,

*Decision will be entered for petitioner in Docket No. 17749-21.*

*Decision will be entered under Rule 155 in Docket No. 17771-21.*